**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy No. 18-70541-JAD |
| | ) | |
| ROBERT W. JAGER, | ) | Chapter 11 |
| MARGARET M. JAGER, | ) | |
| | ) | Related to Doc. No. 89 |
| Debtors. | ) | |
| ——————————————X | ) | |
| | ) | |
| INFIRST BANK, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| -v- | ) | |
| | ) | |
| ROBERT W. JAGER, | ) | |
| MARGARET M. JAGER, and | ) | |
| NORMA HILDENBRAND, | ) | |
| | ) | |
| Respondents. | ) | |
| ——————————————X | | |

## <u>MEMORANDUM OPINION</u>

The matter before the Court is the *Motion to Amend Findings of Fact, Amend Judgment, for Relief from Judgment and/or for New Trial* (ECF No. 89) (the "Motion to Amend") filed by the Debtors, Robert W. Jager and Margaret M. Jager (the "Debtors").[1] By their Motion to Amend,[2] the Debtors seek relief from this Court's *Order* dated November 20, 2018 (ECF No. 79) granting InFirst Bank f/k/a Indiana First Bank ("InFirst Bank") relief from the automatic stay

---

[1] This Court has subject matter jurisdiction to enter a final judgment pursuant to 28 U.S.C. §§ 157 and 1334. This is a core matter pursuant to 11 U.S.C. §157(b)(2)(A).

[2] The caption of this Memorandum Opinion reflects the caption of the Motion to Amend as filed. The Court notes however, that the Debtors are the moving party with respect to the Motion to Amend and InFirst Bank is the responding party.

as to certain real property owned by the Debtors in Clearfield County, Pennsylvania.

For the reasons set forth below, the Court finds that the Debtors have failed to show that they are entitled to relief under Rules 59 and 60 of the Federal Rules of Civil Procedure (as incorporated into bankruptcy matters by operation of Rules 9023 and 9024 of the Federal Rules of Bankruptcy Procedure). Accordingly, the Motion to Amend is denied.

## I.
## Factual & Procedural History

On January 31, 2012, Debtor Margaret M. Jager f/k/a Margaret M. Verhagen executed a commercial promissory note whereby InFirst Bank agreed to lend to Ms. Jager the sum of $300,000 for the purchase of real property. *See InFirst Bank Loan Documents Trial Exhibits* ("InFirst Bank Ex."), ECF No. 73-14, Ex. O, pp. 7-9. To secure the loan, Mrs. Jager granted to InFirst Bank a mortgage on certain real property and improvements described more fully below (collectively, the "Collateral"). See Mortgage, InFirst Bank Ex. O, ECF No. 73-14, pp. 10-19 (the "Mortgage").

The Collateral is an approximately 55-acre tract of land comprised of two separate tax parcels (Clearfield County Tax Map Parcel Nos. 106-M07-000-00074 and 106-M07-000-00060). See Mortgage at 18-19. The Collateral is improved by several buildings, including a two-story farm house (the "Farm House"), a two-bedroom ranch-style house (the "Small House" or "Rental House"), and a barn. The barn also contains an apartment (the "Apartment").

It is uncontested that the Collateral is the subject of an action brought by the Commonwealth of Pennsylvania, Department of Environmental Protection (the "PA DEP") against the Debtors.  Pursuant to the PA DEP action, the Debtors are under court order to remediate certain environmental issues. See e.g., InFirst Bank Ex. Z-EE, ECF No. 73.

Specifically, the PA DEP issued a *Field Order* on September 1, 2015, which required that action be taken with respect to approximately 400 tons of manure located on the Collateral. See InFirst Bank Ex. Z, pp. 16-18.  Since then, additional orders dated July 27, 2016 and February 1, 2017 were entered by the Commonwealth Court of Pennsylvania directing that remediation occur, with the February 1, 2017 order finding that the Debtors were in contempt of their court-ordered responsibilities. See InFirst Bank Ex. AA & BB.

On June 26, 2015, and after Mrs. Jager fell behind on payments on her loan, InFirst Bank confessed judgment against Mrs. Jager. See InFirst Bank Ex. N, ECF No. 73-14. Subsequently, on November 3, 2016, Mrs. Jager married Mr. Jager and on November 18, 2016 Mrs. Jager transferred the Collateral to herself and Mr. Jager as tenants by the entireties.  InFirst Bank has suggested that these events were designed to frustrate InFirst Bank's collection efforts.

InFirst Bank sought to execute on its judgment by scheduling a sheriff's sale of the Collateral which was enjoined by Mrs. Jager's filing of a chapter 7 bankruptcy case in the United States Bankruptcy Court for the Eastern District of New York.  This bankruptcy case was docketed at case no. 8-17-72035 (the "New York Bankruptcy Case").  In those proceedings, Mrs. Jager

3

twice unsuccessfully sought to enter the New York Bankruptcy Court's loss mitigation program relative to the InFirst Bank loan.

InFirst Bank sought, and on May 25, 2018 was granted, relief from the automatic stay as to the Collateral by the New York Bankruptcy Court. A sheriff's sale was scheduled for August 2, 2018.

On July 30, 2018, the Debtors commenced the above-captioned bankruptcy proceeding by filing a small business case under chapter 11 of the Bankruptcy Code. When this case was commenced, Mrs. Jager's New York Bankruptcy Case remained open (although she had received a discharge) and it was uncontested that the PA DEP environmental issues remained un-remedied. Also, as of case filing, InFirst Bank had not received payment on the loan since June 2016 (i.e., for over 2 years).

### The Motion for Relief from Stay

On August 1, 2018, InFirst Bank filed its *Motion for Relief from the Automatic Stay* (the "Motion for Relief")(ECF No. 13), whereby InFirst Bank sought relief from the automatic stay as to the Collateral pursuant to 11 U.S.C. § 362(d)(1) and/or (2).

The Debtors contested the Motion for Relief. In litigating the Motion for Relief, the Debtors did not dispute that they owe a debt to InFirst Bank, that they have no equity in the Collateral, and that real estate taxes were delinquent and accruing. The crux of the Debtors' defense to the Motion for Relief was that the Collateral was allegedly essential to the Debtors' successful reorganization.

At the evidentiary hearing on the Motion for Relief held November 14, 2018 (the "November 14th hearing"), the Debtors presented two alternative plans for reorganization. Under the first alternative ("Plan 1"), the Debtors would retain all of the Collateral and under the second ("Plan 2") the Debtors would only retain a portion of the Collateral—the Farm House and a few surrounding acres. See *Debtors' Trial Exhibit List* ("Debtors' Ex."), ECF No. 70, Ex. 2, pp. 10-18. Testimony at the evidentiary hearing was given by each of the Debtors, and Mr. Elliot Heggenstaller, a Water Quality Specialist at the PA DEP.

A subsequent hearing was held on November 20, 2018 (the "November 20th hearing"), at which time the Court gave its findings on the record and found in favor of InFirst Bank.[3] A separate *Order* granting relief from stay to InFirst Bank was entered on the docket that same day.

In short, the Court found that neither Plan 1 nor Plan 2 were in prospect and were speculative at best.[4] See November 20th Hr'g Tr. 17:19-17:22. As to Plan 1, the Court found significant issues with the proposed funding of the plan as the Debtors' averred income was overstated and failed to account for the loss of horse stall rental income. The Court was also not convinced because the Debtors could not show that the proposed rental of the Apartment

---

[3] A transcript of the November 20th hearing is docketed as ECF No. 82 (the "November 20th Hr'g Tr.").

[4] The issues subject of the November 14th hearing were: (1) whether the Collateral was necessary for an effective reorganization, (2) whether InFirst Bank was adequately protected, and (3) whether the Debtors' bankruptcy case was commenced in good faith. As the Court found that the Debtors failed to demonstrate that the Collateral was necessary for an effective reorganization, the Court did not make any findings as to the two remaining issues. However, the Court retains its right to do so in the future.

was anything more than speculative, and rental income from the Small House was unreliable. As to Plan 2, the Court found that the Debtors failed to demonstrate that they have the necessary funding or have taken any steps towards gaining the necessary approvals to subdivide the Collateral—which is essential to the plan. Finally, the Court found that both plans were impeded by the Debtors' failure to remediate the PA DEP issues for which the Debtors offered no credible plan of resolving in a reasonable amount of time.

### **The Motion to Amend**

On December 4, 2018, the Debtors filed their Motion to Amend. Along with the Motion to Amend, the Debtors also filed contemporaneously therewith several exhibits docketed as a "Supplement/Addendum" to the Motion to Amend ("Supplement") (ECF No. 90).

The Motion to Amend alleges that in granting relief from the automatic stay to InFirst Bank, the Court: (i) failed to appreciate the feasibility of the Debtors' plan to comply with the PA DEP orders by relocating the manure to the barn;[5] (ii) improperly found that the two alternative plans presented at the November 14th hearing were not "in prospect" and that they would allegedly be "financially (and environmentally) feasible in a reasonable period of time[;]" (iii) presents a new proposed plan, styled as "Plan 3", which the Debtors allege would be feasible; and (iv) avers that the Court erred in granting relief from stay as the

---

[5] Basically the Debtors contend that by simply moving the manure to the barn, as opposed to removing it altogether from the land, the Debtors can alleviate the PA DEP issues (which include seepage of the exposed manure into the groundwater).

timing of the motion prevented the Debtors from obtaining a "breathing spell" in which to formulate a plan of reorganization.

In conjunction with the filing of the Motion to Amend, on December 4, 2018, the Debtors also filed amendments to their Summary of Schedules[6] as well as their bankruptcy schedules A/B (property), D (secured creditors), F (unsecured, nonpriority creditors), I (income), & J (expenses). See ECF Nos. 85 & 87.

InFirst Bank filed its response to the Motion to Amend on December 31, 2018 (ECF No. 97), and a hearing was held on January 11, 2019 (the "January 11th hearing"). At the conclusion of the January 11th hearing, the Court took the matter under advisement.

## II.
## Analysis

As an initial note, in filing their Motion to Amend the Debtors do not cite to any specific rule or legal authority which forms the basis of the relief they request. However, at the January 11th hearing, the Debtors stated on the record that the Motion to Amend was brought pursuant to Fed.R.Civ.P. 59 and 60.

Although the legal source of their request for relief is now clarified (to some extent), the Court is no less frustrated by the lack of citation in the Motion to Amend itself.  Motions filed without citation to the specific legal authorities which would support the granting of the relief requested are particularly

---

[6] *Official Form 106Sum Summary of Your Assets and Liabilities and Certain Statistical Information* ("Summary of Schedules").

troublesome. In filing a motion without support, movants attempt (whether intentionally or not) to shift the burden of identifying relevant legal authority and applying such authority to the facts of the case to either this Court or the respondent.  This is troublesome because it is not the responsibility of the Court to make the case for the parties before it. See Chaney v. Grigg (In re Grigg), 568 B.R. 498, 521 (Bankr. W.D. Pa. 2017) as corrected (July 7, 2017) ("As this Court has indicated to the parties in its prior decision dated November 6, 2013, 'it is not the job of this Court to rummage through the files to discern counsel's argument or to lay record for a litigant.' Chaney v. Grigg (In re Grigg), Adv. No. 12-7008-JAD, 2013 WL 5945793, at *5 (Bankr. W.D. Pa. Nov. 6, 2013) (citing Yeomalakis v. F.D.I.C., 562 F.3d 56 (1st Cir. 2009)('It is not our job, especially in a counseled civil case, to create arguments for someone who has not made them or to assemble them from assorted hints and references scattered throughout the brief.'); Campbell v. Hall, 624 F.Supp.2d 991, 1004 (N.D. Ind. 2009)('it is not [the Court's] job to do counsel's work of organizing or formulating a party's arguments'); and In re Boone County Utilities, LLC, 506 F.3d 541, 542 (7th Cir. 2007)('judges are not Sudoku masters ... who enjoy filling in a grid with few hints about where things go.'))")

Moreover, motions which fail to explicitly cite the rules upon which they are brought are fundamentally unfair to the other parties to the litigation. When the Court brought the absence of citation to Rules 59 and 60 to the Debtors' Counsel's attention at the January 11th hearing, Debtors' Counsel attempted to brush off the "oversight" by arguing that based on the way the Motion to

Amend was titled—in that it seeks to amend findings of fact, amend the judgment, relief from judgment, and a new trial—"most lawyers including [InFirst Bank's Counsel] knows that refers to Rule 59 and 60." <u>See</u> Oral Argument, January 11th hr'g at 11:57:15-11:57:35. This rationalization—that it can be presumed or expected that opposing counsel knows the basis of the requested relief—defies pleading standards and contravenes a party's right to know on what grounds relief is sought against it. This is especially true in an instance such as this, where InFirst Bank's Counsel stated on the record at the January 11th hearing that his requests for clarification of the basis for relief went unanswered by the Debtors' Counsel.

Nonetheless, in the interest of resolving the matter before it, the Court will consider the Motion to Amend pursuant to Rules 59 and 60, which are made applicable to bankruptcy cases by operation of Fed.R.Bankr.P. 9023 and 9024.

Specifically, the Debtors request that this Court (i) amend its findings of fact (Fed.R.Civ.P. 59(a)(2)), (ii) amend its judgment (Fed.R.Civ.P. 59(e)), (iii) grant relief from judgment (Fed.R.Civ.P. 60(b)), and/or (iv) grant Debtors' request for a new trial (Fed.R.Civ.P. 59(a)(1)(B)). The Court will address each of these in turn.

### <u>Request for New Trial Under Fed.R.Civ.P. 59(a)(1)(B)</u>

Fed.R.Civ.P. 59(a)(1)(B) provides that "[t]he court may, on motion, grant a new trial on all or some of the issues—and to any party— . . . after a nonjury trial, for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court."

In the Motion to Amend, the Debtors fail to specifically identify which of their allegations support the granting of a new trial. Nor have they identified to the Court any grounds which would warrant a rehearing in a "suit in equity in federal court." However, the Motion to Amend is replete with references to alleged new evidence—in particular the Debtors' Plan 3.

As aforementioned, Fed.R.Civ.P. 59(a)(1)(B) permits the court to grant a new trial "for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court." While this section does not explicitly identify an assertion of "new evidence" as a permissible reason, Fed.R.Civ.P. 60(b)(2) strongly infers as much. Rule 60(b)(2) provides that a court may grant relief from final judgment on account of "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial *under Rule 59(b)*." <u>See</u> Fed.R.Civ.P. 60(b)(2) (italics added). Rule 59(b) speaks to the time limitations to bring a motion for new trial under Rule 59(a).

That Rule 60(b)(2) provides a basis for "new evidence" to be considered as a reason for a new trial under Rule 59(a) was recognized by the Third Circuit Court of Appeals in <u>Compass Tech., Inc. v. Tseng Labs, Inc.</u>, 71 F.3d 1125 (3d Cir. 1995).

In <u>Compass</u>, the Third Circuit was asked to evaluate the lower court's denial of a request to reopen the evidence presented at trial for the purpose of introducing the testimony of a witness whose location was discovered only after the conclusion of trial. In discussing permissible grounds for a new trial under Rule 59(a), the Third Circuit noted that there is no direct reference to asserted

new evidence in the Rule, but that "Rule 60(b)(2) provides that 'newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial' can give rise to relief from a judgment or order." See 71 F.3d at 1130. Ultimately, the Third Circuit found that the lower court abused its discretion in refusing to reopen the evidence to accept the new witness' testimony. See id.

"Rule 59 and Rule 60(b)(2) share the same standard for granting relief on the basis of newly discovered evidence." Compass Tech., Inc., at 1130.

> That standard requires that the new evidence (1) be material and not merely cumulative, (2) could not have been discovered before trial through the exercise of reasonable diligence and (3) would probably have changed the outcome of the trial (Bohus v. Beloff, 950 F.2d 919, 930 (3d Cir.1991)). Any party requesting such relief "bears a heavy burden" (id., quoting Plisco v. Union R. Co., 379 F.2d 15, 17 (3d Cir.1967)).

Id. at 1130.

In their Motion to Amend the Debtors proposed "Plan 3" for the first time, pursuant to which the Debtors would move into the Small House as opposed to taking up residence in the Farm House. The Debtors argue that Plan 3 is feasible in part because it requires a lower plan payment than Plans 1 and 2, does not have the environmental issues of Plan 1, and does not require a survey and subdivision as is necessary for Plan 2. See Motion to Amend, ¶¶15, 25 & 26.

However, fatal to the Debtors' reliance on Plan 3 to merit relief, the Motion to Amend, as well as statements on the record at the January 11th hearing, make it clear that Plan 3 was an option known to the Debtors prior to

the November 14th hearing and is thus, not new evidence. Specifically, in discussing Plan 3 the Debtors state that "Debtors' counsel did not submit all possible plans at the Motion Trial, in part, because he was not authorized to do so." See Motion to Amend, ¶25. Likewise, in paragraph 14, Debtors state that "There is a third Plan alternative, keeping just the Rental which Debtors' counsel *now* has authority to present ("Plan 3")." See Motion to Amend, ¶14 (italics in the original).

At the hearing on the Motion to Amend, the Debtors commented that Plan 3 was essentially presented at the November 14th hearing because the components of Plan 3 could be seen in the breakdown of Plan 1. The Court rejects this position. Not only is this averment in direct contradiction to the Debtors' admissions that Plan 3 was **not** presented due to lack of authorization, but acceptance of this argument would be to permit a party to "data dump" on the Court and opposing counsel and require them to determine all possible configurations of a potential plan. As discussed above, neither the Court nor opposing counsel are mind-readers or soothsayers.  It is not appropriate to require the Court or responding litigants to scour every aspect of the record and make the arguments that a party should plainly put in front of the Court in the first instance.

Accordingly, the Debtors have failed to show that they are entitled to a new trial under Fed.R.Civ.P. 59(a)(1). Further, because the standard to evaluate a claim of new evidence is the same under Fed.R.Civ.P. 59 as it is for

Fed.R.Civ.P. 60(b)(2), any new evidence argument raised under other subdivisions of Rule 59 and Rule 60(b)(2) is similarly without merit.

### Request to Amend Judgment & Relief from Judgment

In their Motion to Amend, the Debtors seek to amend the November 20, 2018 judgment and/or ask for relief from it pursuant both Fed.R.Civ.P. 59(e) and Fed.R.Civ.P. 60(b), respectively. Although not styled as such, the Motion to Amend is akin to a motion for reconsideration, which is evaluated under those same Rules. See Chaney v. Grigg (In re Grigg), Adv. No. 12-7008-JAD, 2013 WL 5310207, at *1 (Bankr. W.D.Pa. Sept. 20, 2013).

> Reconsideration is an extraordinary remedy to be granted sparingly. See e.g., D'Angio v. Borough of Nescopeck, 56 F. Supp .2d 502, 504 (M.D.Pa.1999). A motion for reconsideration is not to be used to reargue matters previously raised and disposed of or to relitigate a matter with which the litigant disagrees. See e.g., Ogden v. Keystone Residence, 226 F.Supp.2d 588, 606 (M.D.Pa.2002). Nor may a reconsideration motion be made to raise new arguments or present evidence that could have originally been presented. See e.g, McDowell Oil Service, Inc.v. Interstate Fire and Cas. Co., 817 F.Supp. 538 (M.D.Pa.1993).

In re Grigg, 2013 WL 5310207, at *3.

As an initial note, whether the Motion to Amend will be analyzed under both Rule 59(e) and Rule 60(b) is at the discretion of this Court. "Regardless how it is styled, a motion filed within [fourteen] days of entry of judgment questioning the correctness of a judgment may be treated as a motion to alter or amend the judgment under Rule 59(e)." Rankin v. Heckler, 761 F.2d 936, 942 (3d Cir. 1985)[7], see also In re Grigg, 2013 WL 5310207, at *2.

---

[7] Fed.R.Bankr.P. 9023 sets the time for filing a motion to alter or amend judgment at fourteen days. See Fed.R.Bankr.P. 9023.

13

It is clear from the Motion to Amend that the Debtors seek to challenge, and have challenged, the correctness of the November 20th judgment in favor of InFirst Bank. Thus, the Court has the option to review the Debtors' request for relief from the judgment as one seeking Rule 59(e) relief only. Nonetheless, in the interest of completeness, the Court will review the Motion to Amend under both Rules 59(e) and 60(b).

### **Request to Amend Judgment under Rule 59(e)**

In order to succeed on a request to alter or amend judgment under Rule 59(e), the moving party must show one of the following: "(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court [rendered its judgment]; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." Max's Seafood Cafe v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999).

The Court has already found that the Debtors do not have a viable claim for relief based upon newly discovered evidence. In evaluating the two additional grounds for Rule 59(e) relief, the Debtors do not allege an intervening change in the controlling law. Nor do the Debtors identify any incorrect facts.[8]

Instead, the Debtors advance two theories for relief. First, that InFirst Bank's filing of the motion for relief from stay was tantamount to the filing of a liquidating plan the consideration of which deprived the Debtors of their

---

[8] The Debtors amended several of their bankruptcy schedules of assets and liabilities following the November 14th hearing. Nonetheless, there is no allegation that the Court misstated facts as they existed on the date of the Motion for Relief hearing.

exclusivity period. Second, that in granting the Motion for Relief, the Court either misapplied or misconstrued the standards set forth in United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assoc., Ltd., 484 U.S. 365 (1988). Here, the Debtors argue that the Timbers standard should be considered a "soft standard" because, in the Debtors' view, the Supreme Court did not intend for a bankruptcy court to hold a plan confirmation hearing when deciding a motion for relief from stay.

The Court notes that both of these arguments could have been presented at the November 14th hearing. As such, Rule 59(e) relief is not appropriate. Nonetheless, assuming that the Debtors had opaquely made such arguments, the Court does not find them convincing.

With respect to the first argument, to the extent that the Debtors' position is that the filing of a motion for relief from the automatic stay during the exclusivity period is an effective violation of the Debtors' § 1121(e)(1) small business exclusivity period, such argument is unsupported by the legal authorities cited by the Debtors. As stated above, the Debtors argue that InFirst Bank's filing of the Motion for Relief is tantamount to the filing of their own liquidation plan during the Debtors' 180-day small business exclusivity period. Thus, it appears that the Debtors seek a determination that the filing for and granting of relief from the automatic stay during a debtor's exclusivity period is impermissible.[9]

---

[9] This argument was not raised by the Debtors prior to the Motion to Amend and in making this argument, the Debtors seek to improperly raise a new issue post-evidentiary hearing. See In re Grigg, 2013 WL 5310207, at *3.

In making their argument, the Debtors point to no authority in the Bankruptcy Code or legal precedent that would support a blanket denial of stay relief during a debtor's exclusivity period. To the contrary, the Debtors' position disregards the Supreme Court of the United States' statement in <u>United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assoc., Ltd.</u>, that:

> Once the movant under § 362(d)(2) establishes that he is an undersecured creditor, it is the burden of the *debtor* to establish that the collateral at issue is "necessary to an effective reorganization." See § 362(g). What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect.* This means, as many lower courts, including the en banc court in this case, have properly said, that there must be "a reasonable possibility of a successful reorganization within a reasonable time." 808 F.2d, at 370-371, and nn. 12-13, and cases cited therein. The cases are numerous in which § 362(d)(2) relief has been provided within less than a year from the filing of the bankruptcy petition. **And while the bankruptcy courts demand less detailed showings during the four months in which the debtor is given the exclusive right to put together a plan, see 11 U.S.C. §§ 1121(b), (c)(2), even within that period lack of any realistic prospect of effective reorganization will require § 362(d)(2) relief**.

484 U.S. 365, 375–76, 108 S. Ct. 626, 632–33, 98 L. Ed. 2d 740 (1988)(footnotes omitted)(emphasis added).

The Court notes that throughout this litigation the Debtors have cited to <u>Timbers</u> as the appropriate authority for determination of the relief from stay issues. <u>See</u> <u>e.g.</u> *Debtor's Amended Pre-Trial Memorandum with Stipulations of Fact*, ECF No. 72, p. 5.

Nonetheless, in Debtors' Motion to Amend the Debtors cite to <u>In re Cardell</u>, 88 B.R. 627 (Bankr. D.N.J. 1988) for the proposition that the filing of a

motion for relief from stay by a creditor secured by the debtor's major asset during the exclusivity period is an attempt to impose a liquidating plan on the debtor. <u>See</u> Motion for Amend, ¶31.

In <u>Cardell</u>, the creditor obtained a pre-petition final judgment in foreclosure against collateral securing a debt owed to it by the debtors. Four days after the debtors' bankruptcy filing, the creditor sought relief from stay to execute on its judgment. In deciding the motion, the bankruptcy court found that not only did the debtors have equity in the collateral (which was actually increasing in value), but that the creditor was adequately protected. Thus, relief from stay was unwarranted under 11 U.S.C. § 362 and the bankruptcy court declined to make a determination as to whether the collateral was necessary for an effective reorganization. <u>See</u> <u>In re Cardell</u>, at 632. After already finding that relief from stay was unwarranted, the bankruptcy court observed that the equitable considerations further supported a denial of relief. One such consideration was that the debtors had not been given their "breathing spell" to formulate a plan of reorganization free from creditor pressure. <u>See</u> <u>id</u>. at 634. Further, that by seeking to foreclose on the debtors' major asset early in the case, the creditor was "imposing its reorganization plan upon the debtors." <u>Id</u>. It is this point that the Debtors in the case *sub judice* rely upon.

This Court is not persuaded by <u>Cardell</u> for the Debtors' position. First, <u>Cardell</u>, which was decided less than one month after <u>Timbers</u>, does not address the statement in <u>Timbers</u> that "even within [the exclusivity] period lack

of any realistic prospect of effective reorganization **will require** § 362(d)(2) relief." Timbers, at 376 (emphasis added).

Second, the Cardell court made its finding of equitable considerations only after completing its § 362 analysis, thus suggesting that § 362 relief is not per se impermissible under those circumstances. Moreover, as relief from stay was already found to be unwarranted due to the debtors' equity in the property and the finding of adequate protection, it is unclear whether the equitable considerations cited by the Cardell court would have been sufficient to deny § 362 relief if otherwise warranted.

While the Debtors are correct that "in enacting chapter 11, Congress determined that an otherwise eligible debtor is entitled to an opportunity to reorganize[,]" (see Motion to Amend, 11 n. 15 (citing In re Clinton Centrifuge, Inc., 72 B.R. 900, 905 (Bankr. E.D.Pa. 1987))), they disregard that in so enacting, "Congress built procedural and substantive protections for creditors into the bankruptcy process." In re Clinton Centrifuge, Inc., at 905. With one protection being § 362(d) relief. Id.

The fact remains that nothing in the plain language[10] of 11 U.S.C. § 362 precludes a creditor from seeking relief from the automatic stay during the plan exclusivity period set forth in 11 U.S.C. § 1121. Had Congress intended to place a mandatory and unalterable injunction during such period of time, it

---

[10] When the statute's meaning is plain, the sole function of the court is to enforce the statute according to its terms. Patterson v. Shumate, 504 U.S. 753, 758 (1992); Hartford Underwriters Ins. Co., Union Planers Bank, N.A., 530 U.S. 1, 6 (2000); Lamie v. U.S. Trustee, 540 U.S. 536, 534 (2004).

certainly could have done so.  But, Congress did not.  Accordingly, this Court declines the Debtors' invitation to re-write the Bankruptcy Code.

The Court now turns to the second of the Debtors' arguments—that a "softer standard" should apply. This argument was not explicitly advanced in the Debtors' Motion to Amend.  Thus, the Court's understanding of the Debtors' arguments is limited to what was stated on the record at the January 11th hearing.

At that hearing, the Debtors explained that their position is that the alleged "soft standard" of <u>Timbers</u> is that the more close to the petition date a motion for relief from stay is filed, doubts are resolved in favor of the debtor. Under this "soft standard," the Debtors averred that the essential question at the November 14th hearing was whether "any plan is possible" and that the Debtors were not required to prove confirmability of a plan, just that a plan was possible.

Because the Debtors failed to lay out their argument in writing, the Court sought clarification of the Debtors' position concerning the role of plan feasibility under the Debtors' theory:

> Counsel: The essential issue before the court was is there a reasonable probability of a successful reorganization within a reasonable time. And that's cited from <u>Timbers of Inwood Forest</u>. In our view your honor this a soft standard. In our view the Supreme Court did not intend a bankruptcy court to basically hold a plan confirmation hearing in response to a relief from stay motion. To read <u>Timbers</u> to require proof of confirmability is to turn chapter 11 on its head. In favor of one creditor to the detriment to the debtors and everyone else.

19

> Court: So you're saying feasibility . . . when <u>Timbers</u> talks about a plan in prospect, it is your view that feasibility is of no moment as a matter of law.
>
> Counsel: I would not go that far. . . .
>
> [unrelated discussion]
>
> Counsel: As I said, looking at feasibility on a relief from stay motion, in my view, contradicts the most fundamental policy of chapter 11. A debtor's exclusive opportunity to propose a plan to find a way to reorganize. With such proposal being measured by the confirmation standards of section 1129.

<u>See</u> Oral Argument, January 11, 2019 hr'g at 12:01:50 -12:04:15.

The Debtors aver that a showing of reasonable probability that a plan can be confirmed early in the case means that the plan is not "patently unconfirmable" and there are no structural impediments to confirming a plan—i.e. that (i) an impaired class must accept the plan, (ii) the absolute priority rule is not violated, and (iii) there is an ability to fund the plan. When questioned by the Court as to the Debtors' omission of feasibility in this list of structural considerations, the Debtors averred that the question of adequate funding is the feasibility component.

The Debtors' position is somewhat confusing to the Court.  On one hand, the Debtors state that a court's consideration of plan feasibility when deciding a motion for relief from stay which is filed during the exclusivity period contravenes the "most fundamental policy of chapter 11."  At the same time, the Debtors concede that to say feasibility has no role in deciding the motion goes too far and that one of the three "structural impediments" cited by the Debtors (e.g., plan funding) is a feasibility component.

20

Moreover, the Debtors ask the Court to consider whether "any plan" is possible without assessing confirmability or feasibility, but also argue that the proper analysis is whether there are any structural impediments to confirmation.

Further complicating this Court's ability to analyze the Debtors' argument is that the Debtors failed to clearly lay out their position in writing with citations to supporting legal authorities (although at the most recent hearing the Debtors averred that their position was supported by the authorities cited in the Motion to Amend). Indeed, prior to the January 11th hearing, the Debtors had not advanced this argument except for recognition that in Timbers the Supreme Court observed that during the exclusivity period "bankruptcy courts demand a less detailed showing" of whether there is "a reasonable possibility of a successful reorganization within a reasonable time." See Timbers, at 376. However, the Debtors did not elaborate on what this "less detailed showing" would entail and whether it was met.

As late as the filing of the Motion to Amend, the Debtors averred that what the Bankruptcy Code requires is a showing that a "pla[n is] feasible and can be implemented in a reasonable period of time." See Motion to Amend, ¶34. Regardless, what is clear to the Court is that the baseline for a motion for relief from stay filed during a debtor's exclusivity period is whether there is "any realistic prospect of effective reorganization" and where the answer is no, relief under § 362(d)(2) will be required. See Timbers, at 376.

21

One case cited by the Debtors in their Motion to Amend, <u>Fairfield Exec.</u>

<u>Assocs. v. Hyperion Credit Capital Partners, L.P. (In re Fairfield Exec. Assocs.)</u>,

161 B.R. 595 (D.N.J. 1993), observes:

> "while 'a lift stay hearing should not be transformed into a
> confirmation hearing,' '[t]he effective reorganization requirement
> enunciated by the Supreme Court ... require[s] a showing by a
> debtor ... that a proposed or contemplated plan is not patently
> unconfirmable and has a realistic chance of being confirmed.' "
> <u>Route 37</u>, 987 F.2d at 157 (quoting <u>In re 266 Washington</u>
> <u>Associates</u>, 141 B.R. 275, 281 (Bankr.E.D.N.Y.1992), <u>aff'd</u>, 147
> B.R. 827 (E.D.N.Y.1992)). Thus, a creditor is entitled to "relief from
> the automatic stay if there is no reasonable likelihood of
> reorganization due to creditor dissent or feasibility considerations."
> 2 <u>Collier on Bankruptcy</u>, ¶ 362.07 at 362–62. Similarly, a creditor
> is entitled to stay relief where the proposed plan violates the
> requirements for confirmation. See <u>Route 37</u>, 987 F.2d at 157.

<u>In re Fairfield Exec. Assocs.</u>, 161 B.R. at 599.

The Court in this case has already made the determination that Plans 1

and 2 are at best, speculative. <u>See</u> November 20, 2018 Hr'g Tr. 17:19-17:22.

The Court further finds them to be unrealistic and implausible. This finding is

based on the concerns enunciated on the record at the November 20th hearing,

and as further detailed in the Court's analysis of relief under Rule 60(b) below.

A major factor in the Court's finding that Plans 1 and 2 are unrealistic is

the Court's observation that the Debtors have offered no realistic plan of

remediation for the environmental issues identified by the PA DEP.  Moreover,

as to Plan 2, the Debtors have not presented any evidence beyond their bare

assertions that the environmental problems do not affect the proposed carve-

out of real property around the Farm House and the feasibility of subdividing

the Collateral.

Stated another way, this Court does not dispute that there is a "sliding scale as to the extent to which a debtor must prove the possibility of an effective reorganization depending on the stage of the case." In re Caldwell's Corners P'ship, 174 B.R. 744, 759 (Bankr. N.D. Ill. 1994)(citing Timbers, 484 U.S. at 376).   However, affording the Debtors in the instant case with such leeway does not obviate the fact that the Debtors must come forward with a modicum of proof that its reorganization is feasible.   The Debtors *sub judice*, however, have not demonstrated that they can propose and confirm a plan that is feasible.   As such, relief pursuant to 11 U.S.C. § 362(d) is warranted under the facts and circumstances of this case.

### Request for Relief from Judgment under Rule 60(b)

On the record at the January 11th hearing, Debtors' Counsel averred that relief would be warranted under Rule 60(b)(6), describing that provision as a "catch-all" pursuant to which Plan 3 may be considered.   Specifically, citing Klapprott v. U.S., 335 U.S. 601, 69 S.Ct. 384, 93 L.Ed. 266, the Debtors averred that Rule 60(b)(6) would permit consideration of Plan 3 as a "change in circumstance" and/or in order to accomplish justice (i.e. that not considering Plan 3 would be a "manifest injustice.")

In Klapprott, the petitioner successfully challenged the entry of a default judgment entered against him over four years prior stripping him of his U.S. citizenship. In rendering its decision, the Supreme Court of the United States found justification for undoing the default judgment pursuant to the then newly amended Rule 60(b)(6). Specifically, the Supreme Court held that Rule

60(b)(6) "vests power in courts adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice." Klapprott, at 615.

However, the question arises of what is meant by "accomplish justice?" Or, stated another way, what is the type of injustice which Rule 60(b)(6) is meant to avoid?

In Klapprott, the Supreme Court was very clear that the specific facts of the case warranted relief for the petitioner. In that case, the petitioner was a German born individual who had been granted U.S. citizenship by naturalization in 1933. Thereafter, he married a U.S. citizen and had a child. In May 1942, after suffering a period of severe illness and financial hardship, proceedings were instituted against the petitioner to strip him of his citizenship for alleged conduct indicative that his oath of loyalty to the U.S. was taken falsely. Unable to afford counsel, the petitioner wrote a letter to the ACLU seeking help but before he was able to mail it he was arrested on charges under the Selective Service Act, 50 U.S.C.A. § 301 et seq. During his imprisonment, FBI agents confiscated his letter to the ACLU—not mailing it— and the time period to respond to his de-naturalization proceedings passed. A default judgment was entered. The petitioner sought help with his naturalization case from his attorney appointed to represent him in his criminal proceedings. Although the attorney promised to help, he did not do so. Ultimately, the petitioner was imprisoned for over six years and moved between three separate facilities. During that time the petitioner's conviction under the Selective Service Act was overturned and charges brought against him for

sedition were dismissed. Thereafter, the petitioner was taken to Ellis Island for deportation when he sought relief from the default judgment.

In assessing whether justice would be served by granting relief, the Supreme Court found that the situation before it was that of a citizen "stripped of his citizenship by his Government, without evidence, a hearing, or the benefit of counsel, at a time when his Government was then holding the citizen in jail with no reasonable opportunity for him to effectively to defend his right to citizenship." Klopprott, at 615. Further, that since charges could not be sustained against the petitioner in the criminal proceedings, that it would be unlikely that sufficient evidence existed to merit the stripping of his citizenship. Id.

The extraordinary circumstances of Klapprott are absent from the instant case before this Court.  Unlike the petitioner in Klapprott, the Debtors only have themselves to blame for not presenting Plan 3 at the November 14th hearing.  Despite Plan 3 being a known option at the time of the November 14th hearing, the Debtors refused their attorney's advice to present it to the Court. Unlike Klapprott, the Debtors have had their fair trial, they are just unhappy with the outcome. See Klapprott, at 615 ("Petitioner is entitled to a fair trial. He has not had it.") They now seek to undo the result by claiming that their own tactical decisions—made with the benefit of counsel—amount to injustice.

Nor is the Debtors' predicament a change in circumstance. As stated, the Debtors knew of the option to present Plan 3 at the time of the November 14th hearing. The only "change in circumstance" between then and now is that the

Debtors are now willing to present Plan 3 because their prior decision to only submit Plans 1 and 2 for consideration did not pan out as they hoped. The Debtors effectively seek a "do-over" in order to present a proposed plan they themselves previously declined to utilize in the relief from stay litigation. This is the epitome of seeking an impermissible "second bite of the apple."

If this Court were to accept the Debtors' position, it would open the door for any litigant to withhold legal arguments and evidence at trial as a means of obtaining a second crack at their case should they lose—amounting to a proverbial adverse judgment insurance policy. This would result in endless litigation and goes against the standard that Rule 59 and 60 motions should not raise new arguments which could have been previously asserted.

### Relocation of Manure to the Barn

In addition to the consideration of Plan 3, the Court will address some of the other arguments set forth in the Motion to Amend.

One large point of contention in the Debtors' Motion to Amend is that the Court unduly failed to give consideration to the Debtors' self-described "eve of trial" solution to remediate the PA DEP issue—namely, to move the manure into the barn structure. In setting forth their argument, the Debtors aver that relocating the manure is an "admitted solution" to the problem as allegedly confirmed by the PA DEP at the November 14th hearing. However, this Court finds the Debtors' characterization of the PA DEP's representative's, Mr. Elliott Heggenstaller's, testimony disingenuous.

At the hearing, Counsel for the Debtors questioned Mr. Heggenstaller about whether relocating the manure to the barn structure would satisfy PA DEP requirements. Mr. Heggenstaller testified that in the Debtors' case, an existing order of court required complete removal of the manure piles from the property—as opposed to relocation to a contained structure—and that the PA DEP would not pursue a remedy inconsistent with the terms of the court order. The Court notes that the court order dated February 1, 2017 (InFirst Bank Ex. BB) requires that the Debtors within thirty days "remove all accumulated manure" and either "land apply,"[11] export, or dispose of the manure. <u>See</u> InFirst Bank Exhibit BB, ¶2(b). When pressed to consider whether, notwithstanding the court order, placing the manure in the barn would satisfy PA DEP regulations, Mr. Heggenstaller hypothesized that housing the manure in barn may possibly comply with PA DEP regulations, but that the PA DEP would have to inspect the barn to make that determination. <u>See</u> Oral Argument, November 14 hr'g at 1:13:55-1:15:36.

Thus, moving the manure to the barn is far from an "admitted solution." Even if the Debtors, specifically, Mr. Jager, were successful in timely relocating the manure piles to the barn—a feat which this Court previously found to be very unlikely especially in the 90 days proposed by the Debtors—the barn solution would contravene the existing court order. Moreover, no evidence was

---

[11] In essence "land apply" means spreading the manure over a large portion of land so that it can decompose.  Land application is not possible or feasible in this case because the manure is laden with saw dust and cannot adequately decompose.

presented to this Court that the barn would pass PA DEP approval as a manure storage facility.[12]

Accordingly, the only proposal for the manure issue has not been shown to be a plausible solution. The Debtors further appear to be without sufficient funds to cover or otherwise remove[13] the manure from the Collateral. As such, the Debtors have no realistic plans to remediate the environmental issues which is a significant impediment to both Plans 1 and 2.

Circling back to the Debtors' averments that the manure could be moved inside the barn within 90 days, the Court previously found this assertion non-credible and extremely unlikely.  The Court's findings were rooted in the fact that Mr. Jager's testimony that he had been devoting substantially all of his time to moving the manure to a specific location (albeit not the barn) were contradicted by the reports of the PA DEP which showed little to no progress in the remediation efforts. Moreover, when Mr. Jager testified that the movement of the manure could occur within three months, the Court found such testimony to be not credible when the Debtors have been unable to complete it in over three years. See November 20, 2018 Hr'g Tr. at 9:25-11:17.

Further supporting this finding, Court observes that since the commencement of this case, the Debtors' self-imposed deadline for remediation

---

[12] Further, the Court questions what effect the relocation of an estimated 400+ tons of manure to the barn would have on the Debtors' ability to rent the barn Apartment which the Debtors identify as a source of revenue for plan funding. Mr. Heggenstaller testified that 200 tons of manure was less than half of what the PA DEP estimated to be on the Debtors' property. See Oral Argument, November 14th hr'g at 1:29:00-1:29:25.

[13] Mr. Heggenstaller testified that it would cost approximately $29,000 for the manure to be removed from the Collateral. See Oral Argument, November 14th hr'g at 1:16:15-1:16:50.

has continued to shift. At the initial hearing on the Motion for Relief held September 6, 2018, Debtors' Counsel represented that Mr. Jager had assured him that the manure would be moved by December 1, 2018.  In the *Debtors' Amended Pre-Trial Memorandum with Stipulations of Fact* filed two months later on November 8, 2018, the Debtors averred that remediation could be completed within five months (ECF No. 72 at ¶20), and then at the November 14th hearing the Debtors asserted that they only require a period of 90 days.

Even if the Court were to afford the Debtors the requested period of time to remediate the hundreds of tons of manure, it is doubtful the Debtors would follow through with the Court's orders. The Debtors, and specifically Mr. Jager, have shown little respect for court orders. For example, pursuant to the *Order* of the Commonwealth Court of Pennsylvania dated February 1, 2017, the Debtors were afforded 30 days to remove all horses and other farm animals from the Collateral and not repopulate the Collateral with such animals absent written approval by the PA DEP. See InFirst Bank Ex. BB, ¶3(c).  It was uncontested that as of the November 14th hearing, and indicated in the filing of the Motion to Amend, the Debtors have continued to board horses in defiance of this order. When asked at the November 14th hearing about their failure to abide by the order, Mr. Jager testified that he was aware of the order, but insisted that the order did not reflect what the judge stated in court and that he would obtain the transcript—thereby indicating that he did not view the order entered well over a year and a half ago as being final, binding and authoritative.  Mr. Jager further stated that he did not remove the horses

because "that's [his] livelihood" and he has the "right to farm." <u>See</u> Oral Argument, November 14th hr'g at 10:51:30-10:53:30, 11:41:00-11:48:15. Thus, it is clear that the Debtors have conscientiously chosen to defy the order and this is not simply an issue of the Debtors not having the funds to comply as the Debtors have alleged. <u>See</u> Motion to Amend, ¶8.

Moreover, the Court is disappointed by the Debtors' characterization of finally removing the horses from the Collateral as an "accommodation the Debtors will make" to allow for the relocation of the manure to the barn. <u>See</u> Motion to Amend, ¶9. Characterizing the removal of horses as an "accommodation" demonstrates that the Debtors continue to view their obligation to remove the horses as a personal sacrifice and not as a serious, court-ordered obligation designed to lesson an environmental hazard Mr. Jager has permeated.[14]

Further, the Court has observed Mr. Jager to be combative, dismissive of directions, and prone to outbursts. This was demonstrated by this Court's need to threaten Mr. Jager with potential sanctions when he continued to interrupt counsel and speak out of turn at the November 14th hearing. Debtors' Counsel himself conceded at the January 11th hearing that Mr. Jager does not listen, is difficult to deal with, and is ignorant of (but presumes he understands) the law. <u>See</u> Oral Argument, January 11th hr'g at 12:29-12:30.

---

[14] By continuing to board horses, Mr. Jager is adding more manure to the problem, as opposed to remediating the manure on site.

Based on these observations, the Court finds the Debtors' assertions that they will do what is required of them within prescribed timeframes non-credible.

### Apartment and Small House Rental Income

Turning to the Apartment rental income, the Debtors challenge the Court's determination that the income from the Apartment is too speculative. See Motion to Amend, ¶18. However, notwithstanding the issue of whether such additional evidence could be considered by this Court, the Debtors provided no information to address the issues with prospective Apartment rental income previously identified—specifically, the Debtors' inability to show that they will be able to relocate to the Farm House, the identity of the alleged prospective tenant, and/or the existence of a lease.

Although the Debtors challenge the finding that the Apartment rental income is too speculative, the Debtors further allege that the Apartment rental income is not necessary for Plan 1. See Motion to Amend, ¶18. Presumably, this is because by their own calculations in paragraph 16 of the Motion to Amend, there is a $488 monthly surplus and the elimination of $450 per month in Apartment rental income would still leave a $33 monthly surplus.[15]

---

[15] For reference, the Debtors propose to fund their plan through a combination of social security income, Apartment rental income, and Small House rental income:

| | | | | |
|---|---|---|---|---|
| R.J. Social Security | $1,079 | | Total Proposed Income | $3,932 |
| M.J. Social Security | $1,953 | | Less Living Expenses | -$1,747 |
| Apartment Rental Income | $450 | | | $2,185 |
| Small House Rental Income | $450 | | Less Plan 1 Payment (see footnote 18) | -$1,697 |
| **Total Proposed Income** | **$3,932** | | **Alleged Proposed Surplus** | **$488** |

31

However, this surplus is reliant on the Debtors receiving $450 per month in rental income from the Small House which this Court found to be too speculative and unreliable.

The Debtors have provided no evidence to challenge the Court's prior findings that the Small House income is unreliable. Specifically, that the current tenants are unreliable in payment and that the Small House is in a state of disrepair raising questions as to whether it could be re-let if the current tenants were evicted or left.

As noted on the record of the November 20th hearing, Mr. Jager conceded at the November 14th hearing that the Small House renters had not yet made the October 2018 payment and had been unreliable in the past. See November 20th Hr'g Tr. 11:18-12:02. Moreover, Mrs. Jager testified at the November 14th hearing that the Small House renters routinely make repairs to the rental on their own volition and deduct the cost of the repairs from the rent payable to the Debtors. Mrs. Jager commented that "it's because of [the Small House renters] that we're in the fix we're in." See Oral Argument, November 14th hr'g 12:32:15-12:33:15.[16]

---

See Motion to Amend, ¶16. The Debtors further allege that an additional $250 will be available per month after November 2020.

[16] Without the Apartment and Small House rental income, a shortfall for Plan 1 would exist as follows:

| | | | | | |
|---|---|---|---|---|---|
| R.J. Social Security | $1,079 | | Total Proposed Income | $3,032 | |
| M.J. Social Security | $1,953 | | Less Living Expenses | -$1,747 | |
| ~~Apartment Rental Income~~ | ~~$450~~ | | | $1,285 | |
| ~~Small House Rental Income~~ | ~~$450~~ | | Less Plan 1 Payment (see footnote 18) | -$1,697 | |
| **Total Proposed Income** | **$3,032** | | **Shortfall** | **-$412** | |

Additionally, the Court notes that its finding that the Small House rental income is unreliable is further supported by the Debtors' year-to-date income as reported on their *Official Form 107: Statement of Financial Affairs for Individuals Filing for Bankruptcy* ("Statement of Financial Affairs"), ECF No. 27, pgs. 27-33, of which this Court takes judicial notice.

The Debtors reported on their Statement of Financial Affairs that between January 1, 2018 and the date of bankruptcy case filing (July 30, 2018—a period of seven months less one day) the Debtors grossed from their business operations only $5,250—$2,625 each. See Statement of Financial Affairs at Part 2, No. 4. The Debtors reported no other[17] income during this time period. See Statement of Financial Affairs at Part 2, No. 5.  Thus, in 2018 until bankruptcy case filing the Debtors averaged $750 ($5,250/7 months = $750) per month in business income.  This figure falls short of the $1,050 per month owed by the Small House tenants in combined Small House and horse stall rental fees.

The instability of income is also reflected in the Debtors' need to file an *Application for Individuals to Pay the Filing Fee in Installments* (ECF No. 3) at the commencement of this case wherein the Debtors averred that they were unable to pay the entirety of the filing fee at once and sought to pay it over a period of four months. The filing fee ($1,717) is less than the initial Plan 1

---

[17] Other income includes "income regardless of whether that income is taxable. Examples of *other income* are alimony; child support; Social Security, unemployment, and other public benefits payments; pensions, rental income, interest; dividends; money collected from lawsuits . . . ." See Statement of Financial Affairs at Part 2, No. 5.  The Court suspects that the Debtors' reporting of income may be inaccurate as it appears to omit their receipt of Social Security payments.

monthly payments as presented at the November 14th hearing, which for months 1-6 are $1,793.13. See Debtors' Ex. 2.[18] The Debtors were unable to afford this fee at a time when they were receiving their social security benefits, Small House rental income, and horse stall rental income, but were admittedly not paying anything to InFirst Bank on the loan or paying real estate taxes.

Finally, with respect to feasibility of Plans 1 and 2 in general, the Court observes that in Debtors' Exhibit 2 presented at the November 14th hearing (ECF NO. 70, pp. 9-18), the Debtors provide in their "Essential Terms of Plan of Reorganization to be Proposed by Debtors" that all administrative expense claims will be paid no later than the effective date of the plan, unless otherwise agreed to by the holder of the claims. See Debtors' Ex. 3, § 3.01. As such, no administrative claims are accounted for in the proposed monthly payments. This is true of the plans proposed at the time of the November 14th hearing as set forth in Debtors' Exhibit 2 and as proposed in the Supplement filed contemporaneous to the Motion to Amend. See Supplement, ECF No. 90, Ex. 4-6, pp. 23-25. A significant hiccup in paying the administrative claims on the plan effective date, however, is that the Debtors do not appear to have the

---

[18] At the November 14th hearing, the Debtors submitted a proposed Plan 1 whereby the Debtors would make initial monthly payments of $1,793.13 (months 1-6), followed by payments of $1,666.02 (months 7-84). See Debtors' Ex. 2. In the "Supplement/Addendum" filed in conjunction with the Motion to Amend, the Debtors modified their Plan 1 proposal to provide for a consistent $1,697.65 payment through the entire plan term (84 months). In order to achieve this, the Debtors altered the proposed treatment of creditor John Deere. Under the original Plan 1, the Debtors proposed to pay John Deere its claim over the first six months of the plan, whereas under the modified Plan 1 John Deere is to be paid 15 days after confirmation and, as a result, its claim is not factored into any monthly payments. Compare Debtors' Ex. 2, p. 10 with Supplement, p. 23. To the extent the Court may consider the modified plan terms, it is unclear to this Court how the Debtors will be able to pay the full amount to John Deere ($762.66) within fifteen days of confirmation in addition to the monthly plan payment and administrative expenses.

funds to make a large cash payment. This is further exacerbated by the fact that as of October 30, 2018 (even before the evidentiary hearing on the Motion for Relief and this Motion to Amend), the Debtors owed their Counsel approximately $20,000—substantially more than the estimated amount of $12,000 set forth in each of the proposed plans. <u>See</u> *Motion to Withdraw*, ECF No. 63, ¶9. Additionally, the Debtors provide that all United States Trustee Quarterly Fees will be paid timely as they accrue. <u>See</u> Debtors' Ex. 2 at p. 13, § 3.03. This is an expense unaccounted for in the proposed plan payment amounts.

Accordingly, the Court finds that no other grounds exist to warrant Rule 60(b)(6) relief.

### **Request to Amend Findings of Fact Pursuant to Rule 59(a)(2)**

Fed.R.Civ.P. 59(a)(2) provides that "[a]fter a nonjury trial, the court may, on motion for a new trial, open the judgment if one has been entered, take additional testimony, *amend findings of fact* and conclusions of law or make new ones, and direct the entry of a new judgment. <u>See</u> Fed.R.Civ.P. 52(a)(2) (italics added).

> "A court faced with a Rule 59(a)(2) motion after a nonjury trial 'should be most reluctant to set aside that which it has previously decided unless convinced that... refusal to revisit the earlier decision would work a manifest injustice.' " <u>Ashraf-Hassan v. Embassy of France</u>, No. CV 11-805 (JEB), 2016 WL 2626833, at *11 (D.D.C. May 6, 2016) (quoting <u>Barnes v. Alves</u>, 304 F.R.D. 363, 366–67 (W.D.N.Y. 2015)). "Rule 59 is not a vehicle for relitigating old issues...or otherwise taking a 'second bite at the apple.' " <u>Id</u>.

<u>Poff v. Prime Care Med., Inc.</u>, No. 1:13-CV-03066, 2016 WL 3254108, at *2 (M.D. Pa. June 14, 2016).

35

As discussed above, the Court does not find that a manifest injustice would occur should the Court refuse to grant the Debtors relief. As such, the Court will not amend its findings of fact consistent with the Debtors' request.[19]

Finally, at the January 11th hearing, the Debtors argued that in their view the order granting relief from the automatic stay was ineffective against a portion of the real property pledged to InFirst Bank. Specifically, the Debtors represented that the real property collateral is comprised of two parcels—a significantly larger, approximately 55-acre parcel containing the farm, and a much smaller (approximately 1/3 acre) parcel on which the Small House sits. Further, that while the larger parcel has the previously identified 1181 Pleasant Valley Road mailing address, that the smaller parcel's address is 1115 Pleasant Valley Road. The Debtors argue that the Motion for Relief solely

---

[19] The Court will make one clarification of its prior findings. At the November 20th hearing, the Court stated that: "Mrs. Jager testified that she was unaware of the status of the probate matter." To clarify, Mrs. Jager testified that leading up to the sheriff's sale scheduled for April 2017, the Debtors had offered InFirst Bank Mrs. Jager's expected inheritance to stop the sale. However, the funds comprising Mrs. Jager's expected inheritance—then allegedly sitting in an unspecified attorney's escrow account—were unable to be paid to InFirst Bank at that time because the decedent's estate had not yet been probated (the testimony suggests that the estate may not have even been opened at that time). Mrs. Jager explained that probate had not been completed because she needed to locate and receive permission from the decedent's relatives, some of whom were located in foreign countries. Mrs. Jager testified that during the course of her New York Bankruptcy Case, her bankruptcy counsel sought her permission to go to the probate office and have her expected inheritance turned over to the trustee. Mrs. Jager testified that she refused to give her attorney permission to do so because at that time she only had ten more people—presumably relatives of the decedent—to contact and Mrs. Jager wanted to finish doing so. Mrs. Jager testified that nonetheless, "they took it and [she] ha[s] no idea of what's going on with it. [She] has not been informed of anything." See Oral Argument, November 14th hr'g at 12:20:50-12:22:30, 12:25:55-12:27:30. Accordingly, what is clear from the record is that Mrs. Jager is unaware of the status of her claimed exemption in the inheritance in her New York Bankruptcy Case. What is unclear to this Court is the status of the decedent's estate—i.e. whether it has been probated or is waiting on further action by Mrs. Jager. This clarification has no effect on the Court's determination that Plan 2 is unfeasible as it does not change the fact that the Debtors have no idea when Mrs. Jager will receive her exempted funds which are necessary to pay for the proposed subdivision of the Collateral essential to Plan 2.

identified the collateral subject of the motion as having the 1181 Pleasant Valley Road address and thus, the Court's order granting the motion is only effective against the larger parcel.

As stated at the January 11th hearing, it is clear from the record of this case that at all times both parties have considered the real property at issue to encompass the entirety of the Collateral. Throughout this litigation, the Debtors themselves have discussed the subject property as containing the Farm House, barn, **and** Small House. Moreover, while InFirst Bank does aver in its Motion for Relief that the subject real property is located at 1181 Pleasant Valley Road (see Motion for Relief at ¶10), the description of the real property at issue in the Motion for Relief explicitly identifies both parcels by separate boundaries and tax map parcel numbers. See Motion for Relief, ¶11.

As such, the Debtors were on notice that the entirety of the real property collateral was at issue and not only did they fail to point out their present argument, but the Debtors proceeded through the litigation as though they considered that to be the case. Indeed, as recent as the Debtors' Motion to Amend, the Debtors stated that InFirst Bank sought relief from stay against their "Property," which they identify as being both parcels. See Motion to Amend, ¶¶1, 4. Moreover, it has also been conceded that the "Farm" property subject of the Motion for Relief contains the Farm House, the rental house (i.e. Small House), and the two-story barn with a second-floor apartment. See Motion to Amend, ¶¶1, 4. Accordingly, the Court disagrees with the Debtors' position.

For the purpose of avoiding any confusion going forward, and to prevent any issues with InFirst Bank's ability to move forward against their collateral, the Court clarifies its *Order* (ECF No. 79) dated November 20, 2018 to make it clear that relief from stay is granted as to both parcels.

### III.
### Conclusion

Based on the foregoing, the Court finds that the Debtors have failed to show that they are entitled to relief under Fed.R.Civ.P. 59 and/or 60, which are made applicable by Fed.R.Bankr.P. 9023 and 9024, respectively.  Accordingly, the Court shall enter an order that denies the Debtors' Motion to Amend.

Dated:  February 13, 2019

jlh
_____
The Honorable Jeffery A. Deller
United States Bankruptcy Judge

cc:    Debtors
       Gary W. Short, Esq.
       Robert F. Manzi, Jr., Esq.