IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| ROBERT W. JAGER and | ) | Bankr. No. 18-70541-JAD |
| MARGARET M. JAGER, | ) | |
| | ) | Chapter 11 |
| Debtors. | ) | |
| ――――――――――――――― | X | |
| | ) | |
| ROBERT W. JAGER and | ) | Related to ECF No. 192 |
| MARGARET M. JAGER, | ) | |
| | ) | |
| Movants, | ) | |
| | ) | |
| - v - | ) | |
| | ) | |
| INFIRST BANK f/k/a | ) | |
| INDIANA FIRST BANK and | ) | |
| THE COMMONWEALTH OF | ) | |
| PENNSYLVANIA DEPARTMENT | ) | |
| OF ENVIRONMENTAL | ) | |
| PROTECTION, | ) | |
| | ) | |
| Respondents. | ) | |
| ――――――――――――――― | X | |

## MEMORANDUM OPINION

The matter before the Court is a motion captioned as a *"Motion to Reconsider"* filed by Mr. & Mrs. Jager (collectively, the "Debtors").[1]  The Motion to Reconsider concerns this Court's prior order dated September 5, 2019 (the

---

[1]  This Court has the requisite subject-matter jurisdiction to hear and decide the Motion to Reconsider pursuant to 28 U.S.C. § 1334 and the standing *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* issued by the United States District Court for the Western District of Pennsylvania on October 16, 1984.  The Motion to Reconsider is a core proceeding in which this Court may enter final judgment pursuant to 28 U.S.C. § 157(a)(1).  See In re Mercado-Jiminez, 193 B.R. 112, 116 (D.P.R. 1996)(motion to vacate order dismissing bankruptcy case is a core proceeding).

00027608

"Dismissal Order"), which dismissed the Debtors' bankruptcy case with prejudice thereby precluding the Debtors from filing another bankruptcy case for a period of 180 days from the date of the Dismissal Order.  For the reasons set forth below, the Motion to Reconsider is without merit and shall be denied.

## I.
## Background

The facts of this case, giving rise to the Dismissal Order, are not overly complicated and are set forth in this Court's prior *Memorandum Opinion* found at InFirst Bank v. Jager (In re Jager), 597 B.R. 796 (Bankr. W.D. Pa. 2019), as well as the memorandum orders entered by this Court at ECF Nos. 144, 166, and 187. The findings and conclusions as set forth in the prior opinions and/or orders of this Court are incorporated herein.

In a nutshell, the Debtors commenced this small business Chapter 11 case on July 30, 2018, and to date they have not been able to present a confirmable plan of reorganization. See 11 U.S.C. § 1121(e)(2)(requiring that a small business plan and disclosure statement be filed no later than 300 days after the petition date) and 11 U.S.C. § 1129(e)(requiring that a small business debtor obtain confirmation no later than 45 days after filing of the plan); see also In re CCT Communications, Inc., 420 B.R. 160, 168 (Bankr S.D.N.Y. 2009) and In re Star Ambulance Service, LLC, 2015 WL 5025840 (Bankr. S.D. Tex., Aug. 24, 2015), for a discussion of the consequences of failing to meet the small business debtor

deadlines.[2]

Since filing this case, the Debtors have had a number of impediments to proposing and confirming a realistic plan of reorganization.  The failure of the Debtors to propose a feasible plan constituted cause for this Court to grant the Debtors' secured lender, InFirst Bank, relief from the automatic stay so that InFirst Bank may pursue non-bankruptcy remedies as to its collateral.  In re Jager, supra.[3]

The impediments in this case also included the Debtors' disagreements with counsel, resulting in Debtors' counsel withdrawing from the case and the Debtors proceeding without the assistance of counsel.[4]  See *Motion to Withdraw*, ECF No. 115.

The impediments included financial issues in that the Debtors have not

---

[2]  By mailing dated June 13, 2019, the Debtors mailed to the Court a binder of various documents labeled "*Reorganization Plan*." See ECF No. 165.  Due to a clerical error in the Clerk's Office, the *Reorganization Plan* was not originally docketed by the Clerk and not delivered to the undersigned Judge.  When this was brought to the Court's attention at a June 28, 2019 hearing, the Court directed that the Clerk immediately docket the *Reorganization Plan* as of June 14, 2019– which is the earliest conceivable date on which the Clerk could have received the document for filing.

[3]  The Debtor has appealed the order granting InFirst Bank relief from stay to the United States District Court for the Western District of Pennsylvania.

[4]  At the November 15, 2019 hearing on the Motion to Reconsider, the Debtors acknowledged that they owe their former counsel $70,000 and that the Debtors do not have the funds for payment of outstanding legal fees.  The Debtors also previously indicated that they lack the funds to pay a $10,000 retainer to obtain a new attorney.  While the record reflects that for the period of August 2018 through July 2019 that the Debtors had a positive balance in their checking account, the inability to pay post-petition expenses reflects that the Debtors are administratively insolvent for bankruptcy purposes. Obviously, administrative insolvency adversely affects the interests of creditors.  For example, the failure to pay for insurance has caused the Debtors' lender to obtain forced-placed insurance.  See *Report of the United States Trustee*, ECF No. 186, at ¶8.

presented any plan demonstrating that the Debtors have the financial ability to carry out their obligations. These circumstances have been fully articulated in the Court's prior determinations, and there is no need to restate them herein. See In re Jager, 597 B.R. at 815-818.

Compounding the financial problems of the Debtors is that they are senior citizens[5] who have been battling various health problems thereby limiting their ability to generate sufficient income to fund their perceived plan.

The income and health issues of the Debtors have additionally prevented them from complying with various environmental enforcement actions that have been levied by the Commonwealth of Pennsylvania. Specifically, the Debtors have long suffered environmental problems with respect to the Debtors' primary asset, which is a 55 acre tract of land (the "Real Property") that contains a farm house, rental house, and a barn with another apartment.

Since September 1, 2015, which is more than four years ago, the Debtors have been subject to a field order (the "Field Order") issued by the Commonwealth of Pennsylvania, Department of Environmental Protection (the "PA DEP"). See Field Order, ECF No. 73-22, pp. 16-18. The Field Order requires the Debtors to remediate approximately 400 tons of horse manure[6] located on their Real Property

---

[5] Mrs. Jager is in her 70's and Mr. Jager is in his 80's. See ECF No. 24, at ¶1. Mrs. Jager has suffered from heart ailments, and Mr. Jager is suffering from cancer. These circumstances certainly make the Court's decision a difficult one, and the Court sympathizes with the Debtors' circumstances.

[6] The filings of record reflect that as of October 16, 2018 there were "at least 4 horses, 2 min-
continue...

to prevent runoff into neighboring streams or waters and other harms.

The Debtors did not comply with the Field Order.  After a hearing, an Order was thereafter entered on July 27, 2016 by the Commonwealth Court of Pennsylvania which required, among other things, that the Debtors remove the manure piles within thirty days thereof.  See ECF No. 73-23.  The Commonwealth Court's July 27, 2016 Order also required that the Debtors, by no later than October 15, 2016, implement a Manure Management Plan with respect to the tons of manure located on the Real Property.

The Debtors did not comply with the July 27, 2016 Order, and on February 1, 2017, the Debtors were found by the Commonwealth Court to be in contempt. See ECF No. 73-24.  Neither of these Orders were appealed by the Debtors.

The February 1, 2017 Order of the Commonwealth Court again set forth a time period for the Debtors to comply with applicable environmental obligations,

---

[6]...continue

donkeys (Mr. Jager unsure of exact #)" located on the Real Property. See *Agricultural Operation Inspection Report* dated October 16, 2018, ECF No. 73-27, p. 4.  The Debtors' alleged "Plan" filed on June 14, 2019 suggests that the Debtors also board 7 horses owned by others. See ECF No. 165 at p. 4. According to literature published by Penn State University, a 1,000 pound horse generates 51 pounds of total raw waste per day See Eileen F. Fabian & Jennifer Smith Zajackowski, Horse Stable Management at p. 2, which can be found at https://extension.psu.edu/horse-stable-manure-management.  Thus, not including stall waste, a 1,000 pound horse generates approximately 9.3 tons of manure per year. Id. Including stall waste, the amount increases by about 8 to 15 pounds of waste per day, which means that a 1,000 pound horse can generate up to approximately 12 tons of total manure per year. Id.  The literature also indicates that while manure can be a valuable resource if managed properly, manure can also be a nuisance if improperly managed.  Improperly managed manure can be a source of water pollution, odor, flies (which transmit disease), parasites, can contaminate drinking water, harm wildlife, and reduce property values. See Athena Lee Bradley, Manure Management for Small and Hobby Farms at p. 3 (Northeast Recycling Council, Inc., May 2019) found at https://nerc.org/documents/manure management/manure management handbook. pdf.

which were then again violated by the Debtors.  The February 1, 2017 Order of the

Commonwealth Court also mandated that the Debtors "close the animal operation

at the property," which was ignored by the Debtors.[7]

In fact, as of the commencement of the instant bankruptcy case on July 30,

2018, the Debtors had complied with neither the Field Order, nor the July 27,

2016 and February 1, 2017 Orders of the Commonwealth Court.

Of course, debtors-in-possession are required to comply with environmental

laws because bankruptcy, as a general matter, is no excuse for failure to comply.

See 28 U.S.C. § 959(b); see also 11 U.S.C. § 1129(a)(3)(requiring as a pre-condition

to plan confirmation that the plan be proposed in good faith and not by any

means forbidden by law).

Stated in other words, environmental obligations imposed by law must be

complied with, and a debtor may not evade or avoid environmental compliance

obligations.  See e.g., Penn Terra Ltd. v. Dept. of Envtl. Res., 733 F.2d 267 (3d Cir.

1984); Midatlantic Nat'l Bank v. New Jersey Dept. Of Envtl. Protection, 474 U.S.

494 (1986).

After the commencement of the instant bankruptcy case, and through the

present, the Debtors have lacked the appropriate resources and/or capabilities

that are necessary to remediate the manure problem.  These facts formed one of

---

[7] The Debtors' refusal to close the animal operation on the Real Property exacerbates the
ongoing manure problem.

00027608                          -6-

the bases of this Court's conclusion that the Debtors cannot propose or confirm

a feasible plan of reorganization.  See In re Jager, supra.  It also constituted one

of the reasons for the Court granting InFirst Bank relief from the automatic stay.

Id.

Throughout the pendency of this bankruptcy case, the Debtors made

various promises to remediate the manure.  None of the promises were kept.

For example, at the September 6, 2018 hearing on InFirst Bank's motion for

relief from stay, it was represented that the manure would be remediated by

December 1, 2018.

Then, on November 8, 2018, the Debtors filed a pre-trial statement advising

that "Debtors have the ability to remediate all environmental issues within a five-

month period with inspections by the DEP to monitor the clean up process." See

Debtors' Amended Pre-Trial Memorandum With Stipulation of Facts, ECF No. 72, at

¶9.  Essentially, by this filing the Debtors acknowledged that the December 1,

2018 commitment could not be met and, instead, they represented that the

manure could be remediated by April 8, 2019.  Almost a week after filing this pre-

trial statement, on November 14, 2018, Mr. Jager testified that he actually needed

only three months to remediate the manure (i.e, that Mr. Jager would have it re-

mediated by February 14, 2019).  These periods, however, passed without

remediation by the Debtors.

With no reorganization in prospect, on March 29, 2019 the Court issued an

*Order Directing Debtors to Show Cause Why This Bankruptcy Case Should Not Be Dismissed and Setting Rule to Show Cause Hearing* (the "<u>Rule to Show Cause</u>"). <u>See</u> ECF No. 144.  By the Rule to Show Cause, the Court set forth its concerns regarding the lack of feasibility occasioned by the Debtors' financial affairs and their inability to remediate the environmental violations cited by the PA DEP.  The Rule to Show Cause required that the Debtors show cause as to why this case should not be dismissed for cause under 11 U.S.C. § 1112.

A hearing on the Rule to Show Cause was ultimately held on June 28, 2019, where it was abundantly clear based on the Debtors' admissions that the Debtors still had not remediated the manure on the Real Property.  Given the extensive period of time the Debtors already had to remediate the property, as well as their advanced age (coupled with limited access to equipment, other assistance and economic resources), it appeared unlikely that the Debtors could remediate the manure.  These circumstances reflected that any plan the Debtors could propose providing for the retention of the Real Property is patently un-confirmable as being not feasible since the Debtors are unable to solve their environmental problem.  Notwithstanding these circumstances, the Debtors still desired an opportunity to go forward with this Chapter 11 case, with the Debtors representing that they could complete their environmental obligations within sixty days.

Sympathetic to the Debtors situation, but recognizing that ample cause existed for the Court to immediately dismiss this bankruptcy case, the Court

00027608                                    -8-

inquired as to whether the Debtors would agree to dismiss their Chapter 11 case

with prejudice if the Debtors failed to remediate the manure within the further

sixty day period as suggested by the Debtors.   The Debtors agreed, thereby

resulting in the Court issuing and entering its Order of July 2, 2019 which stated:

> [i]n recognition of their ongoing environmental problems
> and the barriers they create to plan feasibility, at the
> June 28th evidentiary hearing the Debtors agreed to a
> continuance for a period of sixty (60) days, during which
> time the Debtors are to completely remediate their
> environmental issues.  The Debtors further agree that if
> remediation is not completed during that timeframe, the
> Debtors do not object to dismissal of their bankruptcy
> case with prejudice.

See Order of July 2, 2019, ECF No. 166, p. 4.  The July 2, 2019 Order further

stated with clarity that:

> Within sixty (60) days of the date of this *Order*, the
> Debtors shall completely and without limitation
> remediate all environmental issues/concerns previously
> identified by the Pennsylvania Department of
> Environmental Protection and/or in corresponding
> litigation before this Court or the Commonwealth Court
> of Pennsylvania.   For the purposes of this *Order*,
> complete remediation requires compliance with any and
> all directives of the PA DEP set forth in applicable field
> orders..., as well as any relevant order by the
> Commonwealth Court of Pennsylvania. . . .
>
> On the sixty-first (61st) day following the date of this
> *Order*, or as soon as thereafter practicable, the PA DEP
> shall inspect the Debtors' real property . . . and shall file
> an inspection report and affidavit regarding the Debtors'
> compliance with applicable environmental rules and
> regulations.  To the extent that the PA DEP finds that the
> Debtors have failed to completely remediate their existing
> environmental issues, the PA DEP shall identify with

00027608                                    -9-

> particularity the violation and its scope.  The PA DEP shall serve on the Debtors a copy of any inspection report and affidavit filed with this Court. . . .
>
> In the event that the PA DEP determines that the Debtors have failed to remediate their environmental issues or in the event that the Debtors prevent the PA DEP from making a full inspection, the Court shall enter an order dismissing the Debtors' bankruptcy case with prejudice.  Such dismissal with prejudice shall operate as a bar to the Debtors' filing of a subsequent bankruptcy case for a period of 180 days from the date that the dismissal becomes final.

See Order of July 2, 2019, ECF No. 166, at p. 4, ¶¶1, 3 and 5 (emphasis in original)(paragraph numbers omitted).

During the sixty day period set forth in the Order of July 2, 2019, the Debtors neither advised the Court that they objected to any terms of the Order; nor did the Debtors fully remediate the environmental issues.  As a result, at the conclusion of the sixty day period, the PA DEP inspected the Debtors' property and submitted to the Court an affidavit and inspection report identifying the Debtors' failure to comply with applicable environmental obligations. See *Unsworn Declaration of Elliot Heggenstaller Pursuant to 28 U.S.C. § 1746 and Inspection Report*, ECF No. 185-1.  Thereafter, on September 5, 2019, the Court entered its Dismissal Order. See ECF No. 187.  The Debtors then filed their Motion to Reconsider with the Clerk on September 23, 2019. See ECF No. 192.[8]

---

[8]  The Debtors deposited the Motion to Reconsider into the U.S. Mail on September 19, 2019, and it was received by the Clerk of the U.S. Bankruptcy Court on September 23, 2019.  An examination

continue...

00027608                                      -10-

## II.
## The Motion to Reconsider is Without Merit

The Debtors request that the Court revisit the Dismissal Order, but the Motion to Reconsider does not cite the applicable rule of procedure upon which it is based.

The U.S. Supreme Court has held that a *pro se* pleading, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976); <u>see also</u> <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007).

With this standard in mind, the Court is not required to assume the role of advocate on behalf of a *pro se* party. <u>Merryfield v. Jordan</u>, 584 F.3d 923, 924 n. 1 (10th Cir. 2009).  Nonetheless, courts applying the liberal pleading requirement have concluded that courts interpret a *pro se* pleading as raising the "strongest argument that [it] suggest[s]." <u>Caro v. Weintraub</u>, 618 F.3d 94, 97 (2d Cir. 2010)(citing <u>Triestman v. Fed. Bureau of Prisons</u>, 470 F.3d 471, 474 (2d Cir. 2006) and <u>Harris v. Mills</u>, 572 F.3d 66, 72 (2d Cir. 2009)).

As one court observed, "[i]mplicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro*

---

[8]...continue
of the Motion itself reveals that it is dated September 19, 2019 and the envelope is post-marked September 19, 2019.  <u>See</u> ECF No. 192, at pp. 5 and 10.  The deposit of a document into the mail is not the filing of a document with the Clerk.  Filing occurs when the Clerk actually receives the document, which in this instance is September 23, 2019.  <u>See</u> Fed.R.Civ.P. 5(d)(2)(a paper not electronically filed is "filed by delivering it . . . to the clerk; or . . . to a judge who agrees to accept it for filing"); <u>accord</u> Fed.R.Bankr.P. 5005(a)(1)(place of "filing" is with the "clerk").

*se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir. 1983).

A liberal construction of the Motion to Reconsider is that it can properly be construed as a motion to alter or amend a final judgment pursuant to Fed.R.Civ.P. 59(e).[9] See Int'l Painters & Allied Trade Indus. Pension Fund v. Design Tech., 254 F.R.D. 13, 17 (D.D.C. 2008).

The time period for filing such a motion under Fed.R.Bankr.P. 9023 is fourteen days from the date of the Dismissal Order, which means in the instant case that the deadline for filing the motion was September 19, 2019.  Because the Motion to Reconsider was filed with the Clerk after the deadline on September 23, 2019, it appears that the Motion to Reconsider should be denied as untimely.

A liberal construction of the Motion to Reconsider also is that it may be construed as a motion for relief from the Dismissal Order pursuant to Fed.R.Civ.P. 60(b)(1).[10]  Under this rule, a judgment may be vacated on the basis of "mistake" in the event the Court made a substantive error of law or fact. See Baicker-McKee, Federal Civil Rules Handbook at p. 1226 (Thomson Reuters/West 2014)(citing Utah ex rel. Div. of Forestry, Fire & State Lands v. U.S., 528 F.3d 712, 722-23 (10th Cir. 2008); Manning v. Astrue, 510 F.3d 1246, 1249 (10th Cir. 2007)).

---

[9]   By operation of Fed.R.Bankr.P. 9023, Fed.R.Civ.P. 59 is applicable to bankruptcy proceedings.

[10]   By operation of Fed.R.Bankr.P. 9024, Fed.R.Civ.P. 60 is applicable to bankruptcy proceedings.  The Court has considered the other bases for relief under Fed.R.Civ.P. 60, and has determined that the other sub-sections of Rule 60 either do not apply or that the analysis contained herein also would operate to preclude relief under the other sub-sections.

Motions seeking relief under Fed.R.Civ.P. 60(b)(1) must be brought within a "reasonable period of time," but not more than one year after the entry of the underlying judgment or order.  See Fed.R.Civ.P. 60(c).  Relative to the Dismissal Order, it appears that the Motion to Reconsider was timely filed for Fed.R.Civ.P. 60(b)(1) purposes.[11]  Consequently, the Court will decide the Motion to Reconsider on the merits.

### The Debtors' Attempt to Limit Their Remediation Requirements Is Not Supported by the Record

As to the allegations in the Motion to Reconsider, the Debtors first contend that the Dismissal Order should be vacated because the Debtors believe they have complied with the manure removal requirements of the PA DEP.  In this regard, the Debtors assert compliance because they allegedly remediated only the portion of the manure which was created from and after the date the Debtors acquired the Real Property (i.e., the "manure they were responsible for").[12]  Stated in other words, the Debtors contend that they were not required to remediate all manure "grand fathered" on the site.

What the Debtors fail to acknowledge is that both the state court orders,

---

[11]  The timeliness of a motion pursuant to Fed.R.Civ.P. 60(b)(1) is different than the time period to file a notice of appeal.  The time period to appeal a final order of the Bankruptcy Court is fourteen (14) days from the entry of the order on the docket. See Fed.R.Bankr.P. 8002.

[12]  For purposes of this Memorandum Opinion only, the Court has accepted as true that some manure on site was caused by the prior owners of the property.  The PA DEP has contended that there is no pre-existing manure on site, and that all of the manure located on the Debtors' property is a result of the horses and mini-donkeys boarded by the Debtors.  The Court reserves judgment as to this dispute of fact, to the extent it would ever be justiciable before this Court.

00027608

-13-

and the orders of this Court required that the Debtors remediate all of the piles of manure, regardless of how long they have been on their property.  Support for this conclusion lies in the orders entered in both the Commonwealth Court of Pennsylvania and by this Court.

Specifically, on September 1, 2015, the PA DEP obtained a Field Order, which required the Debtors to take the following corrective action:

> By September 30, 2015 **remove both manure piles 1 and 2** which are adjacent to the horse barn on the North and South and either land apply the manure in accordance with the Manure Management Manual, or store it on the property with a cover more than 100 feet from any water of the Commonwealth. ***Maintain this area free of manure***.

September 1, 2015 Field Order at p. 2 (emphasis added).

After the Debtors failed to comply with the September 1, 2015 Field Order, the PA DEP filed a *Petition to Enforce Order* in the Commonwealth Court of Pennsylvania.  As a result, the Commonwealth Court of Pennsylvania entered its Order of July 27, 2016, requiring the following actions of the Debtors:

> Within thirty (30) calendar days of this Court's Order, [the Debtors] ***shall remove both manure piles 1 and 2***, which were adjacent to the horse barn on the north and south of the Property and either: land apply and/or export the manure in accordance with the Manure Management Manual; or, store it on the Property with a cover, more than 100 feet from any water of the Commonwealth. ***The areas adjacent to the horse barn where manure piles 1 and 2 are located shall be maintained free of manure***, unless otherwise approve by the Department.

July 27, 2016 Order at ¶2 (emphasis added).

A basic reading of the September 1, 2015 Field Order and the July 27, 2016 Order make clear that, at a minimum, the Debtors were to remove the manure piles adjacent to the barn and maintain that area free of any manure—regardless of when the manure was put there.

After the Debtors failed to rectify the identified environmental issues, the Commonwealth Court of Pennsylvania entered another Order dated February 1, 2017 finding the Debtors in contempt of the July 27, 2016 Order. See ECF No. 73-24. The February 1, 2017 Order provides that the Debtors may purge themselves of contempt by remediating the property, and ordered the following:

> Within thirty (30) calendar days of this Court's order, respondents ***shall remove all accumulated manure from Manure Piles 1 and 2 adjacent to the barn and Pile 3 on the south hilltop***, and either: land apply and/or export the manure in accordance with the publication entitled *Land Application of Manure, Manure Management Plan Guidance (361-0300-002)*, a copy of which has been provided respondents, or dispose of the manure in accordance with subparagraph (c) below. ***The areas adjacent to the horse barn where Manure Piles 1 and 2 are located shall be maintained free of manure***.

February 1, 2017 Order at ¶2(b) (emphasis added).

Thus, the Order of February 1, 2017 makes it clear that the corrective actions mandated by the Commonwealth Court necessarily include the Debtors remediating "all accumulated manure" from all three piles in accordance with regulations.

At the November 14, 2018 hearing before this Court on InFirst Bank's motion for relief from stay, Mr. Jager even testified that he was aware of these requirements.  The record of that hearing reflects the following exchange:

Counsel:   Are you aware that that order requires the following. That within seven days you are to prevent manure laden runoff from the farm, you're to cover top manure piles one and two. You are to put hay bales or a slit fence around the manure piles to decrease solids migration and that within thirty days you are required to ***land apply or remove all manure from manure piles 1, 2, and 3***.  Remove all farm animals from the property this would include horses in the stable. Are you aware that that order provides that.

Mr. Jager:   Yes, yes.

November 14, 2018 Hr'g at 10:51-10:52 (emphasis added).

That the Debtors now argue that they were unaware of their obligation to remediate all of the manure is simply not supported by the record and is disingenuous.  Also disingenuous is the Debtors' assertion that this Court only required at the June 28, 2019 hearing that the Debtors "remove <u>only</u> the manure that [they] were responsible for." <u>See</u> Motion to Reconsider at p. 2, ¶1 (underline in the original).

The record reflects that the Debtors have been required to remediate all manure subject to the remediation orders, and not just manure accumulated by the Debtors after they purchased the subject property.  For example, at the June 28, 2019 hearing, the Court and Mr. Jager shared this exchange:

| Court: | When can you remove all the manure? . . . the time period has varied. And we are actually past the time period which you initially represented to the Court that you'd have it removed. |
|---|---|
| Mr. Jager: | Well, like I said you honor. I didn't have the right trucks . . . |
| Court: | But, how much . . . how much time? |
| Mr. Jager: | Well, sixty days it'd be gone, your Honor. |
| Court: | . . . Look, I mean I know times are tough ok. And, I know InFirst Bank has its issues, the DEP has its issues. What if I continued this matter but if you don't have all that manure taken care of in a manner that the DEP finds acceptable within the next sixty days that we just dismiss this bankruptcy with prejudice? |
| Mr. Jager: | You're the boss, your Honor. |
| Court: | But, my point is, I mean you know, you and your wife know that the case can't continue with that manure issue being there because you need to comply and I get that you're doing the best you can. . . . |

June 28, 2019 Hr'g at 3:17-3:19.

Thus, it is undisputed that the Debtors agreed to remove all of the manure within sixty days or face dismissal of their case with prejudice. The Court therefore memorialized the Debtors' agreement in the Court's July 2nd Order.

In the July 2nd Order, the Court wrote that "[i]n recognition of their ongoing environmental problems and the barriers they create to plan feasibility, at the June 28th evidentiary hearing the Debtors agreed to a continuance for a period of sixty (60) days, during which time the Debtors are to ***completely remediate their***

***environmental issues***." Order of July 2, 2019, ECF No. 166, p. 4 (emphasis added).

Further, the Court plainly laid out what it considered to be a complete remediation, ordering that:

> Within sixty (60) days of the date of this *Order*, the Debtors shall completely and without limitation remediate all environmental issues/concerns previously identified by the Pennsylvania Department of Environmental Protection and/or in corresponding litigation before this Court or the Commonwealth Court of Pennsylvania. For the purposes of this *Order*, complete remediation requires compliance with any and all directives of the PA DEP set forth in applicable field orders/orders, as well as any relevant order by the Commonwealth Court of Pennsylvania.

Order of July 2, 2019, ECF No. 166, p. 4 at ¶1.

Given the terms of the September 1, 2015 Field Order, the July 27, 2016 Order, the February 1, 2017 Order, the Debtors' stated understanding that the February 1, 2017 Order required removal or land application of all manure from piles 1, 2, and 3, and the terms of this Court's July 2, 2019 Order, there can be no doubt that the Debtors were informed of the scope of the remediation that was required of them.  As such, this aspect of the Motion to Reconsider lacks merit.

## **The State Court Orders Are Not Reviewable by this Court**

In the Motion to Reconsider, the Debtors also contend that the state court orders obtained by the PA DEP are fraught with error and are not enforceable for a litany of reasons.  Such reasons include due process challenges to the procedures employed in the state court system, as well as legal challenges to the

ultimate ability of the PA DEP to regulate manure located on the Debtors' property.  The Debtors also contend that the orders of the Commonwealth Court are not enforceable because InFirst Bank and the PA DEP are "in collusion."

A fair reading of the Motion to Reconsider is that the Debtors are making a collateral attack on the orders of the Commonwealth Court.  The record, however, reflects that the Debtors have been aware of the state court orders for several years, and have never appealed them (let alone timely appealed them).  Such orders appear to be final, and this Court lacks the requisite jurisdiction to exercise appellate jurisdiction over the judgments of the Commonwealth Court of Pennsylvania. Knapper v. Bankrs. Tr. Co. (In re Knapper), 407 F.3d 573, 582 (3d Cir. 2005)(the Rooker-Feldman Doctrine precludes federal trial courts from exercising appellate jurisdiction over final state-court judgments).  Accordingly, this aspect of the Motion to Reconsider lacks any merit.

## **Dismissal With Prejudice is Appropriate**

The Debtors argue that the Dismissal Order should be vacated because the Debtors allegedly were not sufficiently informed of the "with prejudice" component of the agreed Order of July 2, 2019.  This argument of the Debtors is not persuasive.

Courts have recognized that parties appearing *pro se* are afforded a greater amount of leniency in comparison to counseled litigants. See e.g. Erickson, 551

U.S. at 94; see also Compton v. Moschell (In re Moschell), Adv. No. 19-02104-JAD,

2019 WL 5496055, at *5 (Bankr. W.D. Pa. Oct. 25, 2019).

Such leniency is not without limitation. See United States v. Gregg, C.A. No.

12-322, 2013 WL 6498249, at *4 (W.D. Pa. Dec. 11, 2013) ("However, the Court

may not be co-opted by a *pro se* litigant to perform tasks normally carried out by

hired counsel. . . . Providing assistance or '[e]xtending too much procedural

leniency to a pro se litigant risks undermining the impartial role of the judge in

the adversary system.' " (citations omitted)).

Courts have noted that the special solicitude afforded to *pro se* litigants can

be lessened where the litigant has prior legal experience. See, e.g. Tracy v.

Freshwater, 623 F.3d 90, 102-03 (2d Cir. 2010).

According to the United States Supreme Court, trial court judges have "no

obligation to act as counsel or paralegal to *pro se* litigants." Pliler v. Ford, 542 U.S.

225, 231 (2004).  In this regard, the Third Circuit Court of Appeals held that

courts have no obligation to provide legal advice to *pro se* litigants. Mala v. Crown

Bay Marina, Inc., 704 F.3d 239, 244 (3d Cir. 2013).[13]

---

[13]   The instant case before the Court is quite different from cases where the presiding trial court
judge converts a pending motion seeking one type of relief into a motion seeking a different type of
relief. See Mala, 704 F.3d at 245 (citing Castro v. United States, 540 U.S. 375, 383 (2003), and noting in
the *habeas* context that district courts provide notice to *pro se* litigants before converting any motion to a
motion to vacate under 28 U.S.C. § 2255); see also id. (citing Renchenski v. Williams, 622 F.3d 315, 340
(3d Cir. 2010), and noting that district courts must provide notice to *pro se* prisoners of the effects of not
filing any opposing affidavits when a motion to dismiss is converted into a motion for summary
judgment).  The record in the instant case is that from and after the issuance of the Rule to Show Cause,
the Debtors' case was under consideration for dismissal, and ultimately the case was dismissed because
the Debtors failed to remediate the manure as required by the many orders governing the situation.  In
continue...

By way of example, courts have no obligation to inform *pro se* litigants of an impending statute of limitation. Id. (citing <u>Outler v. United States</u>, 485 F.3d 1273, 1282 n. 4 (11th Cir. 2007)). Similarly, *pro se* litigants "do not have a right– constitutional, statutory, or otherwise– to receive how-to legal manuals from judges." Id. (citing <u>McKaskle v. Wiggins</u>, 465 U.S. 168, 183-84 (1984)). As the United States Supreme Court held in the context of *habeas* litigation, where defendants' protections are at their highest:

> "[T]he Constitution [does not] require judges to take over chores for a *pro se* defendant that would normally be attended to by trained counsel as a matter of course." <u>See also</u> <u>Martinez v. Court of Appeal of Cal., Fourth Appellate Dist.</u>, 528 U. S. 152, 162 (2000) ("[T]he trial judge is under no duty to provide personal instruction on courtroom procedure or to perform any legal 'chores' for the defendant that counsel would normally carry out"). Explaining the details of federal habeas procedure and calculating statutes of limitations are tasks normally and properly performed by trained counsel as a matter of course. Requiring district courts to advise a *pro se* litigant in such a manner would undermine district judges' role as impartial decisionmakers.

<u>Pliler</u>, 542 U.S. at 231 (Thomas, J.).

Regardless, consistent with applicable law, this Court makes every effort to accommodate litigants who are unrepresented by counsel. The matter *sub judice* is no different.

---

[13]...continue

addition, the Debtors were amply advised (and agreed) in open court of the consequences for failure to timely remediate (i.e., that the case will be dismissed with prejudice), and the consequences were clearly spelled out in the Court's July 2, 2019 Order.

In the open court discussion with the Debtors at the Rule to Show Cause hearing, the Court stated on at least four different occasions that the Debtors' failure to remediate the manure by the conclusion of the additional sixty day time frame would result in dismissal of this case "with prejudice." See June 28, 2019 Hr'g at 3:17-3:25.  And again, the Debtors agreed to this consequence.

The Court even made it a point to ask Mrs. Jager if she agreed with the terms of the continuance.  At no time did either of the Debtors indicate that they did not understand the "with prejudice" component of the dismissal if the Debtors failed to remediate.

Moreover, at the Rule to Show Cause hearing the Court had no reason to suspect that the Debtors would not ask for clarification if needed. The Debtors, especially Mr. Jager, have been active participants in this bankruptcy case and have had no trouble voicing their concerns, objections, and questions to the Court.  In fact, to maintain appropriate decorum in the courtroom, this Court previously had to caution Mr. Jager against his outbursts and argumentative behavior.

Nonetheless, as with the scope of the remediation, the Court exercised great care by ensuring the full explanation of the terms of the agreed sixty day extension by writing in its Order the following:

> In the event that the PA DEP determines that the Debtors have failed to remediate their environmental issues or in the event that the Debtors prevent the PA DEP from making a full inspection, the Court shall enter

> an order dismissing the Debtors' bankruptcy case <u>with prejudice</u>. Such dismissal with prejudice shall operate as a bar to the Debtors' filing of a subsequent bankruptcy case for a period of 180 days from the date that the dismissal becomes final.

<u>See</u> Order of July, 2, 2019, ECF No. 166, pp. 5-6 at ¶5.[14]

As such, the record reflects that the "with prejudice" consequences for failure to remediate the manure during the additional sixty day extension were clearly laid out by the Court.

The record further reflects that Debtors filed nary an objection to the "with prejudice" term contained in the Court's Order of July 2, 2019; nor did they seek either a clarification of the July 2nd Order or make any filing with this Court indicating that the terms of the July 2nd Order conflicted with the Debtors' understanding of the agreement made at the Rule to Show Cause hearing on June 28, 2019.

Rather, it was only <u>after</u> the conclusion of the sixty day period when the Debtors failed to live up to their stated promise, and <u>after</u> their case was dismissed on September 5, 2019, that they came forward and filed the Motion to Reconsider on September 23, 2019.  This state of the record clearly indicates that

---

[14]  Historically, courts have debated in the bankruptcy setting as to whether dismissal "with prejudice" can operate as a permanent bar to either a debtor's filing a subsequent bankruptcy case and/or ability to obtain a discharge in any later filed bankruptcy case. <u>See</u>, <u>e.g.</u>, <u>Casse v. Key Bank, National Association (In re Casse)</u>, 198 F.3d 327 (2d Cir. 1999) and <u>Colonial Auto Ctr. v. Tomlin (In re Tomlin)</u>, 105 F.3d 933 (4th Cir. 1997), for a discussion of the issue.  To avoid over complication of the issue, and to provide the Debtors with the opportunity to later seek a bankruptcy discharge, the Court's Order of July 2, 2019 made it clear that the Debtors were merely precluded from obtaining bankruptcy relief for a period of 180 days, which is a common restriction ordered in the Western District of Pennsylvania when a bankruptcy case is dismissed "with prejudice."

the Debtors fully understood what the phrase "with prejudice" meant, and that the

Debtors understood the consequences of failing to comply with their obligation to

remediate the manure.[15]  Based on this state of the record, the Court does not find

the Debtors' argument to be convincing and the Motion to Reconsider should be

---

[15]The Court notes that dismissal with prejudice is consistent with 11 U.S.C. § 109(g), which
provides that:

> [N]o individual or family farmer may be a debtor under this title who has
> been a debtor in a case pending under this title at anytime in the
> preceding 180 days if . . . the case was dismissed by the court for willful
> failure of the debtor to abide by orders of the court. . .; or . . . the debtor
> requested and obtained the voluntary dismissal of the case following the
> filing of a request for relief from the automatic stay provided by section
> 362 of this title.

See 11 U.S.C. §§ 109(g)(1) and 109(g)(2).  Dismissal with prejudice is also consistent with 11 U.S.C. §§
105(a) and 349(a), which permits the Court to dismiss a bankruptcy case and impose a bar or restriction
on subsequent bankruptcy filings.  See, e.g., In re Casse, 198 F.3d at 336.  While there is no need to re-
hash the events of this case, factors which certainly support dismissal of the Debtors' bankruptcy case
with prejudice include: (1) this is a successive bankruptcy filing by Mrs. Jager, which was filed to
prevent InFirst Bank from foreclosing against the Real Property, (2) the Real Property was re-conveyed
to the Debtors as tenancy by entireties at a period of time suggesting that the reconveyance was done  to
frustrate the remedies available to InFirst Bank (see Deed, ECF No. 70, pp. 25-28), (3) the Debtors have
articulated no intention on changing or modifying their use of the Real Property, thus exacerbating the
environmental problems to the detriment of InFirst Bank's collateralized interest, (4) the Debtors made
repeated promises to remediate the Real Property, but such promises were hollow, and (5) despite having
the benefit of bankruptcy protection for an extended period of time, the Debtors have made no real
progress at confirming a plan, and have not articulated a cognizable basis in which they could achieve
confirmation without violating their obligations under applicable law.  Simply stated, any subsequent
case within the next 180 days would be a mere tactic to delay and harm InFirst Bank from pursuing its
collateralized interest (for InFirst Bank has received relief from stay in this court, after having obtained
relief from stay by the bankruptcy court in Mrs. Jager's previous case more than a year ago, and any
subsequent bankruptcy case would result in litigation over the applicability of the automatic stay in the
successive case. See 11 U.S.C. § 362(n)(providing that the § 362(a) stay provisions do not automatically
apply where a debtor "was a debtor in a small business case that was dismissed for any reason by an
order that became final in the 2-year period ending on the date of the order for relief entered with respect
to the petition"); § 362(c)(3)(A)(providing that the § 362(a) stay "with respect to any action taken with
respect to a debt or property securing such debt . . . shall terminate with respect to the debtor" after 30
days in a case where the debtor was a debtor in prior case which was pending and dismissed in the
preceding year); and Bankrs Tr. Co. of Cal. v. Gillcrese (In re Gillcrese), 346 B.R. 373 (Bankr. W.D. Pa.
2006) (termination of automatic stay after 30 days under § 362(c)(3)(A) does not apply to property of the
estate)).

00027608

-24-

denied on this basis.

### The Recusal Request is Denied

In the Motion to Reconsider, the Debtors argue that the Court has some sort

of "age bias" and that the Court should recuse itself if the Court does not grant

reconsideration.  In support of its request, the Debtors make the unsubstantiated

claim that this Court is "hesitant to grant consideration to people of our age" and

that the Court is "prejudiced against us. . ." See Motion to Reconsider at p. 2.

In canvassing the record, the Court believes that the Debtors are referring

to an exchange between this Court and Debtors' prior counsel regarding plan

feasibility.  This colloquy occurred at the initial hearing on InFirst Bank's motion

for relief from stay, which was held September 6, 2018.  In discussing potential

plan terms at that hearing, the following exchange occurred:

> The Court:   What authority do you have in a chapter 11, [that] a thirty year
> repayment plan is reasonable . . . when the debtors themselves
> are in their seventies?

> Counsel:   Well, I don't think bankruptcy courts, any bankruptcy court,
> can use age of the debtor to deny confirmation of a plan
> because I think that would be blatant . . . discrimination . . .

> The Court:   Well [it's] not age of the debtor.  It goes to feasibility. You know.
> . . There are cases which talk about the duration of the
> repayment plan [that] also goes into the feasibility of it.

> Counsel:   Well my response would be, your Honor, that the lending
> industry routinely makes loans to peoples in, as . . .

> The Court:   But that's different. . . but that's different than plan feasibility.
> . . . There are these other regulations [that] govern the lending
> of money, but then there's a statute that deals with feasibility.

Counsel:      Your Honor, I'm not aware of any case law in my thirty-five
              years that would block feasibility on the age of the debtor. . . .

The Court:  . . . Not blocking on the age . . .

Counsel:      . . . it may exist . . . it may exist.

The Court:  Not blocking it on the age, age in of itself.  I mean, what do you
            have to prove in order to prove that a plan is feasible.

Counsel:      Your Honor, Mrs. Verhagen has a three-hundred thousand
              dollar life insurance policy in the event of her death to pay off
              the bank. That would help on feasibility . . .

The Court:  And that certainly does. Absolutely.

See September 6, 2018 Hr'g at 11:39-11:41.

Revisiting the issue later in that same hearing, the following exchange took

place between counsel and the Court:

Counsel:      . . .  Keep in mind Your Honor, even though the 300 month
              term is what I use initially, there is a drop off in payments after
              60 months of about $500, that $500 could be moved on to the
              bank that they have a step payment arrangement and that
              would reduce the term but I don't think, Your Honor, we can
              reduce the term below their expected lifetimes. I just don't
              think we can do that. My hunch [Mr. Jager's] expected lifetime.
              . .

The Court:  I'm not telling you what to do in that regard. I merely asked
            you what is the legal authority out there.

Counsel:      Your Honor, all I can say is that [I'm not aware] of any legal
              authority that a plan term was fatal to confirmation because of
              the age of the debtors. Now there may be such authority but
              I'm just not aware of it.   Because the banking industry, your
              Honor, makes loans to people in their 60s and for instance,
              InFirst Bank made this loan. . .

00027608                                  -26-

> The Court:  [I don't] disagree with that at all, Mr. Short. But in chapter 11 you have the feasibility requirement, that's all . . .
>
> Counsel:  . . . [let me] make this one point . . .
>
> The Court:  . . . that's an extra statutory item.
>
> Counsel:  Right . . .

September 6, 2018 Hr'g at 12:04-12:07.

It is clear from the exchanges quoted above that the Court did not raise the issue of the Debtors' ages in some act of spite or ill-will towards the elderly. Instead, age was raised in the context of plan feasibility. Stated another way, the question presented to the Court was whether it is feasible for the Debtors to complete a thirty-year plan when Mr. and Mrs. Jager admittedly had health problems and were in their 80's and 70's, respectively. See ECF No. 24, at ¶1.

In contrast to the Debtors' attempts to cast the Court's inquiry as being discriminatory, the age of debtors has been found by other courts to be a relevant and appropriate consideration in determining plan feasibility for purposes of Chapter 11 bankruptcy.

For example, in United States v. Haas (In re Haas), 162 F.3d 1087 (11th Cir. 1998), the debtors proposed a plan predicated on the 68 year-old debtor-husband continuing to practice law for a period of thirty years. See id. at 1090.   In assessing plan feasibility, the Eleventh Circuit Court of Appeals noted that the "plan itself must offer a reasonable prospect of success and be workable." Id. (citation omitted).   Quoting the lower court, the Eleventh Circuit found that the

debtor-husband " 'cannot be expected to practice law on a full-time basis for another 30 years.' That alone dooms the plan as infeasible." Id.; see also In re Louden, 69 B.R. 723, 726 (Bankr. E.D. Mo. 1987) (identifying as a basis for finding the debtor's alternative plan not feasible the fact that the 73 year old farmer proposed to pay his secured creditor ". . . over a 30 year period, a period longer than his life expectancy[.]")

The fact that the Debtors' age and physical condition bears on the question of plan feasibility was recognized by the Debtors in their own pleadings in this case.  In the Debtors' response to the motion for relief from stay filed by InFirst Bank, where plan feasibility was first raised by InFirst Bank, the Debtors' identified Mr. Jager's age as a limitation on future income available for plan funding.  In this regard, the Debtors averred that "Due to his age, Mr. Jager's trucking income will be generated for several years only and will not be relied [on] in the long term." ECF No. 24, at p. 5 n. 8.

 Obviously, the Debtors' ages and physical conditions also have bearing on their ability to remediate the manure located on their property.  Which, again, is relevant to determining plan feasibility because the Debtors have to comply with applicable law as a condition to confirmation of any plan.

As set forth above, it is wholly appropriate to consider the Debtors' ages, income, and physical capabilities when determining whether a proposed Chapter 11 plan of reorganization is feasible.  Consequently, the recusal request set forth

in the Motion to Reconsider shall be denied.[16] <u>See</u> <u>Liteky v. United States</u>, 510

U.S. 549, 555 (1994)(judicial rulings alone almost never constitute a valid basis

for a bias or partiality motion); <u>accord</u> <u>Securacomm Consulting, Inc. v.</u>

<u>Securacomm, Inc.</u>, 224 F.3d 273, 278 (3d Cir. 2000)("displeasure with legal

rulings does not form an adequate basis for recusal")(citing <u>In re TMI Litig.</u>, 193

F.3d 613, 728 (3d Cir. 1999) and <u>Jones v. Pittsburgh Nat'l Corp.</u>, 899 F.2d 1350,

1356 (3d Cir. 1990)); <u>In re Shuma</u>, 124 B.R. 446, 449 (Bankr. W.D. Pa.

1990)("rulings by the Court afford no basis for bias and prejudice inasmuch as

they are subject to appeal and erroneous ones can be corrected through appellate

processes")(citing <u>Ex Parte American Steel Barrel Co.</u>, 230 U.S. 35 (1913) and <u>Rea</u>

<u>v. Ford Motor Co.</u>, 337 F. Supp. 950 (W.D. Pa. 1972)).

### No Further Plan Hearing Was Required

Finally, in the Motion to Reconsider the Debtors complain that the Court

never held a final confirmation hearing on the Debtors' "plan." This complaint

rings hollow because the Court made its point clear at the June 28, 2019 hearing

that a pre-condition to consideration of any "plan" was the Debtors remediating

---

[16] The Debtors' motion does not set forth the statute upon which the recusal request is based. Nonetheless, the Court has considered the recusal request pursuant to the provisions of 28 U.S.C. § 455(a), which states that any "justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Another statute also deals with bias or prejudices, which is 28 U.S.C. § 144. This statute does not apply because the plain language of 28 U.S.C. § 144 requires that the motion to recuse not only be accompanied by an affidavit of the complaining party, but also that the motion be filed not less than ten days before the beginning of the term at which the proceeding is to be heard. Inasmuch as no affidavit accompanied the Debtors' recusal request, and that the recusal request has been made after much litigation and dismissal of the Debtors' bankruptcy case, the recusal provisions of 28 U.S.C. § 144 are not applicable to the Debtors' motion. <u>See</u>, <u>e.g.</u>, <u>United States v. Sammons</u>, 918 F.2d 592, 598 (6th Cir. 1999).

the manure consistent with both the PA DEP's Field Order and the Orders of the

Commonwealth Court of Pennsylvania.  The Court even acknowledged as much

in its July 2nd Order, where it wrote:

> In the event that the PA DEP determines that the
> Debtors have complied with their environmental
> obligations, the Court shall set a continued hearing on
> the Rule to Show Cause to address the Other
> Confirmation Issues (as described in footnote 3 of this
> Order)[17], which remain unresolved.  The parties are
> reminded that the ongoing environmental issues are not
> the only concerns raised in the Rule and that successful
> remediation shall not automatically discharge the Rule
> or be interpreted as a finding that the Debtors are able
> to propose a confirmable plan.  To the extent that the
> Debtors are successful in remediating their
> environmental issues, the Other Confirmation Issues will
> be addressed in later proceedings.

See Order of July 2, 2019 at p. 6, ¶6.

Of course, the Debtors never complied with their environmental obligations

despite having over four years to do so.  As set forth in this Court's prior

*Memorandum Opinion* concerning Infirst Bank's relief from stay,[18] it appears that

the Debtors either lack the ability to remediate the manure or they are making a

conscience choice to disregard their duties under applicable law. See In re Jager,

597 B.R. at 814-15.  Under either set of circumstances, confirmation of any "plan"

---

[17]  The "Other Confirmation Issues" included "questions regarding the Debtors' ability to fund a plan, the treatment of creditors in a plan, and whether the Debtors can even propose a chapter 11 small business plan at this stage of the case [.]" See Order of July 2, 2019 at p. 3, n. 3.

[18]  The Court had granted InFirst Bank relief from stay, and the Debtors moved for relief from the Court's order.  The *Memorandum Opinion* addressed the merits of the Debtors' motion asking for *vacature* or amendment of the order in favor of InFirst Bank.

providing for the Debtors' retention of the Real Property without adequate remediation of the manure is impossible.

Even if the Court were to conduct a further "plan" confirmation hearing as requested by the Debtors, the admissions of the Debtors in their Motion to Reconsider and other papers indicate that the Debtors' "plan" is not feasible.

For example, the Debtors recognize that there is a need to find additional sources of revenue to fund their plan, and indicate an intent to operate a proposed "non-profit" called "Horse Therapy 4 Troubled Vets, Inc."

While it is commendable that the Debtors desire to form a business to help disabled veterans, the Debtors' "plan" acknowledges that they do not have any capital to fund this venture. Instead, the Debtors' "plan" proposes to raise funds by soliciting donations, including utilizing a "GO FUND ME" campaign on the internet. See (Proposed) Chapter 11 Plan at pp. 2-3, ECF No. 165. The "plan" also lacks any specificity as to the fee structure, revenue, and expenses of this venture, thereby precluding the ability of the Court to find this business enterprise feasible.[19] In addition, the Debtors have admitted in their pleadings that they "cannot proceed[] further [with this venture] until we are finished in court." See

---

[19] Stated in other words, the venture as described by the Debtors is too speculative to support a finding in favor of feasibility. See In re Chadda, No. 07-12665bif, 2007 WL 3407375, at *5 (Bankr. E.D. Pa. 2007)(chapter 11 plan was not feasible when it relies, in part, on the debtor's establishment of businesses which were only in their planning stages and none of the "needed licenses, employees, start-up capital, equipment, business structure, or marketing efforts [were] in place").

ECF No. 211 at ¶9.  Thus, it appears that this venture is illusory.[20]

Another speculative component of the Debtors' "plan" is its reliance on certain lawsuits for funding.  For instance, the Debtors list three lawsuits in the "plan" against (1) USAA Insurance Co., NY, (2) former tenants, identified as "the Youngs",  and (3) Fleet Management and J&M Towing. See (Proposed) Chapter 11 Plan at p. 5, ¶¶(c)-(e).

The Debtors disclose little information about the status of these actions, with the exception of the action against the Youngs, which was only just recently filed in state court on October 30, 2019. See September 2019 Monthly Operating Report, ECF No. 210, p. 18 at ¶25.

However, from what is disclosed in the record, it appears that the Debtors are unrepresented in the actions against USAA and Fleet Management and the value of those actions (although filed for certain amounts) has been stated as "unknown." See *Amended Schedule A/B: (Property)*, ECF No. 87 at pp. 12 & 14, ¶¶19 & 33.

Given the lack of information regarding the status of the lawsuits, as well as the very preliminary nature of the lawsuit against the Youngs, the Court can only conclude that success is too speculative to support a finding of feasibility. See

---

[20]   The Debtors have indicated no interest in curtailing horse operations at the Real Property. When asked by the Court as to why the Debtors want to continue the horse operations, Mr. Jager testified that "farming is in my blood and horses, that's all I've done."  See November 14, 2018 Hr'g at 12:13:09-12:15:53.  The Debtors, however, are required by the state court orders cited above to remove the horses and/or donkeys from the Real Property but ignored these directives.  Obviously the proposed horse therapy business under the "plan" violates the applicable state court orders as well.

In re WR Grace & Co., 729 F.3d 332, 348-49 (3d Cir. 2013)(plan not feasible if it "hinges on future litigation that is uncertain and speculative, because success in such cases is only possible, not reasonably likely")(quoting In re Am. Capital Equip., LLC, 688 F.3d 145, 156 (3d Cir. 2012)).

The preceding are just a few examples of as to why the Debtors' "plan" on its face has feasibility obstacles. There may be additional impediments to confirmation, and this Memorandum Opinion does not address all of them.[21]

*[Remainder of Page Intentionally Left Blank]*

---

[21]  The Debtors have not filed a disclosure statement pursuant to 11 U.S.C. § 1125 to accompany their alleged "plan." Therefore, in order for the Debtors to even have a confirmation hearing on their "plan" a number of procedural steps must be completed. The steps would be: reinstatement of the case, the discharge of the Rule to Show Cause, the filing of a disclosure statement to accompany the "plan", hearing on the adequacy of the disclosure statement, approval of the disclosure statement, approval and transmittal of a solicitation package to creditors, voting by creditors, and final hearing on confirmation of the "plan." See 11 U.S.C. §§ 1125, 1126, 1128, and 1129.

### III.
### Conclusion

The record in this matter supports the dismissal of the instant bankruptcy case with prejudice.  For the reasons set forth above, the Court shall enter an order that denies the Motion to Reconsider.

Dated: November 25, 2019

_____
The Honorable Jeffery A. Deller
United States Bankruptcy Judge

FILED
11/25/19 4:07 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

Case Administrator to Mail Copies to:

Mr. Robert Jager & Mrs. Margaret Jager, *Pro Se*

Robert F. Manzi, Jr., Esq., Counsel to InFirst Bank

Geoffrey J. Ayers, Esq., Counsel to the Commonwealth of PA,
                    Dept. of Environmental Protection